COMMONWEALTH *vs.* WILLIE R. LATIMORE.

Bristol.   April 2, 1979. — August 7, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & LIACOS, JJ.

*Homicide. Evidence,* Cross-examination. *Practice, Criminal,* Directed
   verdict, Capital case.

At a murder trial, the judge did not err in excluding a question to the
   bartender of the tavern in which the homicide had occurred as to
   whether he knew that the victim had a substantial portion of al-
   cohol in his blood that day. [675]
Discussion of the standard by which a judge presiding over a criminal
   trial is to determine whether the evidence presented up to the time
   of a motion for a directed verdict is legally sufficient to permit the
   submission of the case to the jury. [676-678]
At a murder trial, there was sufficient evidence to warrant the denial
   of the defendant's motions for directed verdicts of not guilty as to
   charges of murder in the first degree and murder in the second
   degree. [678-679]

INDICTMENT found and returned in the Superior Court
on October 29, 1975.

The case was tried before *Sgarzi, J.*

*Reuben S. Dawkins* for the defendant.

*William A. Schroeder,* Assistant District Attorney, for
the Commonwealth.

QUIRICO, J. The defendant Willie R. Latimore was con-
victed of murder in the first degree for killing Philip
Poirier in a fight between the two men at a tavern. On
this appeal, the defendant argues that it was error to
deny his separate motions for directed verdicts of not
guilty, not guilty of murder in the first degree, and not
guilty of murder in the second degree. He also argues that
error was committed in excluding a certain question on
cross-examination. Finally, the defendant seeks relief un-

der G. L. c. 278, § 33E.[1] Because the primary issue under-lying all of these arguments is whether the verdict of murder in the first degree was contrary to the weight of the evidence, we review the testimony at the trial in some detail.

Certain facts are not in dispute. The homicide took place at a tavern called the Canadian Club (Club) in Taunton on the evening of October 18, 1975. Between approximately 6 and 6:40 P.M., the defendant and his brother, both black, and a white female companion en-tered the Club, ordered three beers, and sat down in a booth. Six persons, including the owner/bartender Jo-seph J. Kmiec, witnesses Paul Salamon and two of his friends, and an unidentified couple, were present at the Club when the defendant and his companions arrived. The victim came in soon afterward, and Salamon's friends and the couple left. Except for the defendant and his brother, all of the patrons in the Club that night were white.

Sometime during the evening, the defendant and his brother and their female friend became noisy while play-ing pool. The bartender told them to keep their voices down because other persons were watching television. Poirier, the eventual victim, approached the defendant and his companions and also told them to be quiet. Ac-cording to the defendant, Poirer said, "You heard the bartender say, 'Keep the noise down.' " The defendant answered, "You're on the wrong side of the bar to give orders." After this brief, and apparently not very heated, exchange, Poirier returned to the bar and Latimore and his companions returned to their booth and finished their beers. Alma and Edward C. Doherty, who testified for the Commonwealth, came in and sat down between Poirier and Salamon, who were their friends. Soon after, the defendant and his party left the Club.

---

[1] The defendant testified at trial that he was present at the scene. At oral argument he waived a claim of error concerning the admissi-bility of in-court and out-of-court identifications.

Approximately twenty to thirty minutes later, the defendant reentered the Club alone and a fight between him and Poirier began. There is a disagreement, which we shall discuss, about how it started. The two men scuffled; they fell to the floor with Poirier on top; then somehow the defendant got free (again, there is dispute as to how) and ran to the door. Salamon threw a barstool at the defendant as he ran out. Meanwhile Poirier got up from the floor and was staggering around, tugging on his shirt. He again fell to the floor, and died from a single stab wound in his left chest. The knife or other weapon that caused the wound had cut through a rib and entered his heart. No knife or other weapon was ever found.

The defendant, who testified at his trial, stated that after leaving the Club for the first time he, his brother, and the woman drove to a package store where, on reaching for his wallet to pay for his purchase, he discovered that it was missing. They then drove to his brother's apartment so that the latter could pick up some medication he was taking, after which they drove back to the Club. The defendant went in, while the other two remained in the car. According to the defendant, his purpose in going back to the Club was "[t]o look for my wallet."[2] The defendant testified that when he entered the Club the second time, he saw the group consisting of Salamon, Poirier, Doherty, and Doherty's wife sitting at the bar. He approached them intending to ask if they had seen his wallet but, "before I could say 'Excuse me,' and start a conversation, Poirier jumped up and said, 'Get out

[2] The defendant's brother, who was a witness for the Commonwealth, also testified that the three went first to a package store and then to his apartment to "pick up my pills" before returning to the Club. He gave no reason for their return. He testified that the defendant reentered the Club alone while he and the woman waited outside in the car in the parking lot. "Not very long" afterward, according to his testimony, the defendant came out and said that he had been in a fight. The three of them then drove to the brother's apartment. The woman could not be located at the time of the trial and did not testify.

of here, you black mother fucker.' " The defendant told
Poirier to keep his mouth shut.

Then, according to the defendant's testimony, Poirier
punched him in the eye and they began to fight. Eventually they wrestled to the floor, Poirier on top, and Poirier
pulled out a knife and tried to stab the defendant. They
struggled over the knife, "and the last thing I remember,
I flipped him over off me, and I just ran out the door." As
he was running, the defendant heard Poirier scream, and
he admitted on cross-examination that he thought Poirier might have been stabbed. The defendant testified he
never had the knife firmly in his hand and did not have
it with him when he ran out of the Club.

Other eyewitness testimony about the fight was given
by Kmiec, Salamon, Doherty, and Doherty's wife, all of
whom were friends of the victim. None of these witnesses
testified to seeing a knife in either party's possession
during the fight, and each said he or she did not observe
the stabbing. The testimony of each was that, after Latimore reentered the Club, he exchanged words with Poirier.[3] Kmiec and Mrs. Doherty said they did not see who
started the actual fighting; Salamon said he heard, but
did not see, the defendant hit Poirier and then saw Poirier get "off the stool and grapple[ ] with the black male."
Doherty testified that the defendant shoved Poirier before Poirier stood up to fight.

During the actual fight, which lasted only a few minutes, Kmiec was working at the other end of the bar.
Doherty went to the telephone to call the police, and his
wife tried to remain uninvolved by watching television.
None of these three witnesses observed the fight closely

---

[3] None reported hearing Poirier say, "Get out of here, you black
mother fucker." Mrs. Doherty did not hear any of the specific words
the two men said, but described the exchange as not being loud. Kmiec
and Doherty heard the two men arguing, but did not hear everything
that was said. Salamon described the defendant as clearly the verbal
aggressor, shouting, " 'Why don't you learn to keep your mouth shut,'
in a very, very loud voice" before Poirier said anything.

or saw how it ended; they simply reported being aware of the fighting, and then seeing the defendant run out the door and Poirier stagger around clutching his bloody shirt before collapsing. Only Salamon testified in any detail about what occurred. He said that after the two men grappled together Poirier was on top. Then, according to Salamon, Poirier helped the defendant up, saying, "I'm in worse shape than you are." Poirier's shirt was torn. Salamon thought that the fight was over and turned around to get his drink. He then heard Poirier say, "Oh, son of a bitch." When he turned around he saw Poirier, holding his side, start to run around the room, and the defendant going to the door. Salamon threw a stool at the departing defendant and the victim collapsed.

1. *Exclusion of question on cross-examination.* Before considering the legal implications of this review of the evidence, we address the defendant's claim that the judge's exclusion of a question the defendant sought to ask the witness Kmiec on cross-examination was error. The proposed question was: "Would it surprise [you] to know that [Poirier] had a substantial portion of alcohol in his blood that day?" The pathologist testified that the victim had a .05% level of blood alcohol at the time of the fight, .10% being the level at which a driver is presumed to be "under the influence of intoxicating liquor" under the motor vehicle laws. G. L. c. 90, § 24 (1) (*e*), as amended through St. 1974, c. 425. In these circumstances, we cannot say that the judge abused his discretion in determining that the words "a substantial portion" were unfairly conclusory. In any event, testimony that the victim did have alcohol in his blood was admitted through the pathologist. The defendant did not rely, in his testimony or in final argument, on any contention that the victim was drunk and therefore pugnacious. We cannot conceive any possible prejudice that might have befallen the defendant by excluding the question. We therefore hold that the exclusion of the question was not error.

2. *Motions for directed verdicts.* The defendant filed two separate motions for directed verdicts of not guilty, one as to the charge of murder in the first degree, and another as to the charge of murder in the second degree. The judge denied both motions and the defendant contends that their denial was error.

We first consider the standard by which a judge presiding over a criminal trial is to determine whether the evidence presented up to the time of a motion for a directed verdict is legally sufficient to permit the submission of the case to the fact finder, in this case the jury, to decide the innocence or guilt of the accused. If, at that point, the evidence is not legally sufficient to permit submission of the case to the jury, the judge must direct a verdict of not guilty if the defendant makes a proper motion therefor. If the judge instead erroneously denies the motion and submits the case to the jury, a verdict of guilty cannot be upheld, notwithstanding unimpeachable instructions by the judge to the jury on the Commonwealth's burden of proof of the defendant's guilt beyond a reasonable doubt.

In a long line of cases commencing with *Commonwealth* v. *Cooper,* 264 Mass. 368, 373 (1928), and continuing through *Commonwealth* v. *Clark, ante* 392, 403-404 (1979), we have said in one form of words or another that a motion for a directed verdict should be denied "if all the circumstances including inferences [that are not too remote according to the usual course of events] are of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt." Accord, *Commonwealth* v. *Vellucci,* 284 Mass. 443, 445 (1933); *Commonwealth* v. *Cavedon,* 301 Mass. 307, 314 (1938); *Commonwealth* v. *Barker,* 311 Mass. 82, 90-91 (1942); *Commonwealth* v. *Clifford,* 374 Mass. 293, 296-297 (1978); *Commonwealth* v. *Vitello,* 376 Mass. 426, 460-461 (1978).

In reviewing the denial of motions for directed verdicts in criminal cases, we have frequently said that "we must consider and determine whether the evidence, in its light

most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient ... to permit the jury to infer the existence of the essential elements of the crime charged ...." *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). Accord, e.g., *Commonwealth* v. *Dunphy*, 377 Mass. 453, 455-456 (1979); *Commonwealth* v. *Seay*, 376 Mass. 735, 737 (1978); *Commonwealth* v. *Campbell*, 375 Mass. 308, 311-312 (1978). Such statements are elliptical and they represent but one part of the required test of the sufficiency of the evidence to permit submission of a case to the jury. Additionally, the evidence and the inferences permitted to be drawn therefrom must be "of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt," as required by *Commonwealth* v. *Cooper, supra,* and our other decisions which are in accord therewith.

In a very recent decision based on the due process clause, the United States Supreme Court said, by reference to its prior decision in *In re Winship*, 397 U.S. 358 (1970), that an appellate court reviewing the denial of a criminal defendant's motion for a directed verdict must adopt the following approach: "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. ... [The] question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979) (five to three decision). Thus, to sustain the denial of a directed verdict, it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have

satisfied a rational trier of fact of each such element beyond a reasonable doubt. We consider the directed verdicts standard required by *Jackson* v. *Virginia, supra,* to be substantially comparable to that heretofore applied by this court in *Commonwealth* v. *Cooper, supra,* and other cases cited above in accord therewith.

Applying the tests stated in our decisions and in *Jackson* v. *Virginia, supra,* we hold that the evidence was sufficient to permit the jury to find the defendant guilty of murder in the first degree under either of two theories. First, the jury could have have inferred that the defendant procured a knife or other weapon while he was away from the Club and returned with the intention of killing the victim. See *Commonwealth* v. *Watkins,* 373 Mass. 849, 852 (1977); *Commonwealth* v. *Peters,* 372 Mass. 319, 320 (1977); *Commonwealth* v. *Stillwell,* 366 Mass. 1, 5-6 (1974), cert. denied sub nom. *McAlister* v. *Massachusetts,* 419 U.S. 1115 (1975); *Commonwealth* v. *Rooney,* 365 Mass. 484, 487 (1974); *Commonwealth* v. *Nordstrom,* 364 Mass. 310, 312-313 (1973); *Commonwealth* v. *Smith,* 363 Mass. 876, 877 (1973) (rescript); *Commonwealth* v. *Pratt,* 360 Mass. 708, 715 (1972). Second, whatever the origin or source of the fatal weapon, the jury could have inferred that the defendant stabbed the victim after both had arisen from the floor after their fight. See *Commonwealth* v. *Greene,* 372 Mass. 517, 521-522 (1977); *Commonwealth* v. *Zukoski,* 370 Mass. 23, 28-29 (1976). This is not a case like *Commonwealth* v. *Ancillo,* 350 Mass. 427, 432-433 (1966), or *Commonwealth* v. *Fancy,* 349 Mass. 196, 200 (1965), where the proof left an essential element of the crime entirely to conjecture or surmise. Rather, the proof established circumstances from which the jury could reasonably infer in light of common experience that the defendant intentionally killed the victim after deliberate premeditation. "The fact that the evidence did not require the jury to draw the inference [of guilt] does not preclude the conclusion [that the motions for directed verdicts were properly denied]. It is sufficient that the

evidence permitted the inference which the jury obviously drew ...." *Commonwealth* v. *Nelson*, 370 Mass. 192, 203 (1976). For these reasons, we hold that there was no error in denying the motions for directed verdicts.

3. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record carefully on the law and the facts. Unlike *Commonwealth* v. *King*, 374 Mass. 501, 507 (1978), and cases there cited, there was evidence that this killing was more than simply the culmination of a senseless brawl. Unlike *Commonwealth* v. *McInerney*, 373 Mass. 136, 153-154 (1977), there are no circumstances here demonstrating the formation of an impulse to kill which, while legally culpable, was not deliberately premeditated. Accordingly, there shall be no relief under § 33E.

4. *Conclusion.* For the reasons stated in the body of this opinion, the judgment of conviction is affirmed.

*So ordered.*