COMMONWEALTH *vs.* VINCENT LABELLA. January 6, 1984. *Practice, Criminal,* Required finding. *Betting. Evidence,* Opinion. *Probable Cause.*

The defendant was charged with five violations of the gaming laws. A jury in the Superior Court convicted him of two of the five charges: illegally setting up or promoting a lottery, on January 7, 1982, in violation of G. L. c. 271, § 7, and on the same date, keeping a building containing apparatus, books and devices for registering bets in violation of G. L. c. 271, § 17. On appeal, the defendant argues that the judge erred in (1) denying his motion for a required finding of not guilty on both charges on the basis of insufficiency of the evidence, (2) allowing a State police officer to give opinion testimony, (3) failing to suppress items seized pursuant to a search warrant, (4) denying a request for an evidentiary hearing to test the veracity of the affidavit supporting the application for the warrant, and (5) refusing either to order disclosure of the identity of the informant referred to in the affidavit or to conduct an in camera hearing to investigate the matter further. We affirm the judgments.

1. The Commonwealth's case consisted of the testimony of three State police officers and the introduction of nineteen exhibits, the bulk of which were seized on January 7, 1982, during the search of a single family house located at 5 Great Neck Road, Mashpee. The exhibits included nine telephones found on the premises and listed to two Massachusetts telephone numbers, bills for those telephones, "cuff lists," notebooks, numerous envelopes, bank statements, newspapers, a 1981 calendar, a quantity of gel paper, and $17,460 in cash.

James M. Cummings, a State police trooper with experience in the investigation of illegal gambling activities, testified about the seizure of the exhibits and their significance to illegal gambling. He indicated that the "cuff lists" constituted records of debts owed a bookmaker by bettors, that the envelopes were probably used to separate payments to bettors and to store money for future payoffs, and that the water soluble gel paper was favored by bookmakers because it could be immediately destroyed by contact with water if the police tried to seize it. Various editions of the Herald-American were found on the premises opened to a section called "The Edge" or "The Latest Line." This column furnishes the latest betting lines on professional and college sporting events. Penned in next to "The Edge" in one of the newspapers were notations identified as a book-

maker's line on sporting events. To the right of the column were observed a series of numbers which Trooper Cummings identified as bets on numbers play consistent with the conduct of an illegal lottery.

Several pieces of paper bearing names like "Houston" or "Dallas" were seized. An envelope and an open notebook were found on a table and contained the point spread or line on sporting events, final scores of the events, and various notations which indicated sums of money owed a bookmaker. On the 1981 calendar were notations which suggested to the trooper the names of individuals who either owed or were owed money for illegal bets. In a briefcase was discovered a pad with notations which disclosed at least three locations where funds for an illegal gambling operation could have been secreted. In Trooper Cummings' opinion, the nine telephones were used by a bookmaker to ensure that his business could be conducted without interruption. While the search warrant was being executed, these telephones rang four or five times and were answered by the police. All the callers, upon hearing a trooper's voice, hung up without a response. A telephone call by Trooper Cummings to a number bearing a 212 area code listed on the telephone bills sent the defendant reached a recording of the "Howie Copen Sports Line," a service which furnishes the results of sporting events.

There was further testimony by a second State trooper that, on December 17, 1981, the defendant had been seen in a local lounge receiving a white envelope from one person and telling another person, prior to the receipt of a second envelope, "Give me your numbers before you have anything to drink." Subsequently, three other patrons of the lounge were observed approaching the defendant and handing him either a piece of paper or an envelope.

There was also evidence concerning the defendant's use of the premises at 5 Great Neck Road, including observations of him in the house on at least two occasions, the sighting of his automobile at the house at least five times, the discovery of mail addressed to the defendant on the premises, and verification that the telephones in the house were listed to the defendant and that the bills for the telephones were sent to him.

There was considerable additional testimony by Trooper Cummings detailing the modus operandi of illegal bookmakers and relating the trial exhibits to the defendant's role as a bookmaker. The trooper's testimony concluded with the opinion that the defendant was conducting an illegal gaming operation out of the premises at 5 Great Neck Road, Mashpee.

The defendant asserts that there was insufficient evidence to establish that he promoted a lottery within the definition of that term set forth in *Commonwealth* v. *Lake*, 317 Mass. 264, 267-268 (1944). See also *Commonwealth* v. *Rivers*, 323 Mass. 379, 381 (1948); *Mobil Oil Corp.* v. *Attorney Gen.*, 361 Mass. 401, 406 (1972). This assertion overlooks the substantial evidence presented by the Commonwealth indicating that the defendant was conducting a gambling operation based at 5 Great Neck

Road and the very specific evidence that the defendant was actually taking bets on illegal numbers, a game in which "the element of chance . . . predominates [over] . . . the element of skill." *Commonwealth* v. *Lake, supra* at 267. On all the evidence, the jury could have concluded beyond a reasonable doubt that the defendant's activities were principally devoted to taking bets on sports events and that his activities included as well the taking of a small number of bets on illegal numbers, perhaps for the convenience of good sports-betting customers. The charge under G. L. c. 271, § 7, was adequately made out under the standard set forth in *Commonwealth* v. *Latimore,* 378 Mass. 671, 677-678 (1979).

We are also not persuaded by the defendant's arguments, as to the second charge, that there was insufficient proof that he was either "keep[ing] a building" or that the building contained "apparatus, books or devices" for registering bets. There was ample evidence from which the jury could have concluded that the defendant had access to, and asserted control over, the house at 5 Great Neck Road.. Indeed, at one point defense counsel conceded that the defendant's occupancy of the house had been "conclusively" established. This evidence, viewed under the *Latimore* standard, satisfied the "keeping" element of the offense. The substantial physical and documentary evidence seized from the house was adequately linked to the defendant. The testimony describing the uses to which the evidence either was put, or could have been put, justified a finding that most of the items seized were "apparatus, books or . . . device[s]" used for registering bets. See *Commonwealth* v. *Demogenes,* 349 Mass. 585, 587 (1965). The Commonwealth was not required to establish that a bet had been taken on the premises on January 7. In view of the condition of the house on January 7, and the observation of the defendant there a few days before, it was also unnecessary for the Commonwealth to show that the defendant had been at the premises on January 7. We are satisfied that the charge under G. L. c. 271, § 17, was also proved, under the *Latimore* standard, beyond a reasonable doubt.

2. There was no error in the admission of opinion testimony from Trooper Cummings describing the habits of bookmakers and the significance of the evidence seized under the warrant to the charges before the jury. The trooper stated his previous experience in the investigation of illegal gambling operations. Much of the opinion testimony was first elicited by defense counsel in his extensive cross-examination of the trooper. That testimony was thereafter considerably augmented, without defense objection, by the prosecutor in redirect examination. We further note defense counsel's agreement with the judge's observation that Trooper Cummings had been qualified "as an expert at least to the extent of characterizing the slips and notations and other things." The settled standards governing the admission of opinion testimony were not violated in this case. See *Venini* v. *Dias,* 5 Mass. App. Ct. 695, 697-698 (1977).

3. Based on Trooper Cummings' testimony, the judge could have found that the items which the defendant claims should not have been seized under the search warrant had been properly taken either (a) as "plausibly related . . . proof [of] criminal activity of which [the officers] were already aware," *Commonwealth* v. *Bond,* 375 Mass. 201, 206 (1978), or (b) for safekeeping in view of the defendant's arrest and the unsecured condition of the house after the search (the premises were in fact burglarized a few days later). The seizure of the items did not, as claimed by the defendant, vitiate the lawfulness of the search.

4. The informant's information in the affidavit supporting the application for the search warrant satisfied the familiar two-pronged basis of knowledge and veracity tests for crediting an informant set forth in *Aguilar* v. *Texas,* 378 U.S. 108 (1964), and *Spinelli* v. *United States,* 393 U.S. 410 (1969). See *Commonwealth* v. *Upton,* 390 Mass. 562 (1983). The contents of the affidavit, when considered apart from paragraph 12, establish the existence of probable cause for the search. We note that the defendant does not question the accuracy of the substantive information contained in paragraph 12. We consider any inaccuracies in paragraph 9 of the affidavit to be inconsequential. We conclude that the denial of the defendant's oral request for an evidentiary hearing, under the principles of *Franks* v. *Delaware,* 438 U.S. 154 (1978), was proper because any misstatements did not affect the integrity of the affidavit as a whole or destroy the existence of probable cause for the search. See *Commonwealth* v. *Murray,* 359 Mass. 541, 548 (1971); *Commonwealth* v. *Nine Hundred & Ninety-two Dollars,* 383 Mass. 764, 768 (1981); *Commonwealth* v. *Honneus,* 390 Mass. 136, 142 (1983); *Commonwealth* v. *Sheppard,* 5 Mass. App. Ct. 765 (1977).

5. The defendant's request for disclosure of the informant's identity was based upon the alleged misstatements contained in the affidavit. None of the information in paragraph 12 of the affidavit was supplied by the informant. We find, as apparently did the judge below, no other inaccuracy in the affidavit serious enough to call for an in camera hearing. Beyond this, the defendant failed to develop any other reason which would require disclosure of the informant's identity or require the judge to make further inquiry regarding the veracity of the affidavit. See *Commonwealth* v. *Swenson,* 368 Mass. 268, 277-278 (1975); *Commonwealth* v. *Douzanis,* 384 Mass. 434, 441-443 (1981); *Commonwealth* v. *Abdelnour,* 11 Mass. App. Ct. 531, 534-537 (1981).

*Judgment affirmed.*

*Walter T. Healy (Frederick C. Mycock* with him) for the defendant.
*Russell J. Redgate,* Assistant District Attorney, for the Commonwealth.