COMMONWEALTH *VS.* GEORGE LABADIE[1]
(and three companion cases[2]).

Nos. 11-P-1002 & 11-P-1069.

Worcester. April 2, 2012. - July 25, 2012.

Present: GRASSO, BERRY, & WOLOHOJIAN, JJ.

Further appellate review granted, 463 Mass. 1112 (2012).

*Embezzlement. Credit Union. Bank. Federal Preemption. Jurisdiction,* Federal preemption. *Possession of a False Note With Intent to Utter. Attempt.*

This court concluded that a Federal credit union is not a "bank" for purposes of G. L. c. 266, § 52, and even if a Federal credit union were a bank for purposes of the statute, Federal law would preempt any prosecution for embezzlement under that statute. [265-269]
At the trial of an indictment charging attempted possession of counterfeit notes, the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the defendant had used a computer seized from his home to research counterfeiting and to try the process himself; likewise, on an indictment charging possession of counterfeiting tools, the evidence was sufficient to permit a rational trier of fact to find beyond a reasonable doubt that the computer, a scanner, and a printer constituted implements adapted to and designed for making counterfeit currency within the meaning of G. L. c. 267, § 13. [269-271]

INDICTMENTS found and returned in the Superior Court Department on November 10, 2005, and December 5, 2006.

INDICTMENT found and returned in the Superior Court Department on December 5, 2006.

The cases were tried before *Peter W. Agnes, Jr.,* J.

*Dana Alan Curhan* for George Labadie.

*Jeffrey T. Travers,* Assistant District Attorney, for the Commonwealth.

*Paul C. Brennan* for Susan Carcieri.

*Stephen J. Carley,* Assistant District Attorney, for the Commonwealth.

[1]Otherwise known as John Davis.
[2]Two against George Labadie and one against Susan Carcieri.

WOLOHOJIAN, J. The defendant Susan Carcieri was employed as the assistant manager of the Wyman Gordon Federal Credit Union (Wyman Gordon) and lived with her husband, the defendant George Labadie, across the street from Wyman Gordon. Carcieri knew that on August 27, 2002, Wyman Gordon was holding extra cash in its safe in anticipation of a long holiday weekend and end-of-month paychecks. At approximately 7:50 A.M. that morning, she telephoned 911 to report that an unknown man had forced his way into the bank behind her as she was opening Wyman Gordon for business and that he had compelled her to open the safe. Several circumstances, including the fact that Carcieri was only loosely bound when police arrived at the scene, made investigators suspicious of her story. Suspicion solidified two days later when bundles of cash in denominations stolen from Wyman Gordon, including some still wrapped in distinctive bands from the Federal Reserve Bank (Federal Reserve), were found in the couple's home.[3] Many other circumstances confirmed the idea that the defendants were responsible for the theft.[4] A jury convicted Carcieri of embezzlement from a bank by a bank employee, G. L. c. 266, § 52, and Labadie as a joint venturer.[5]

The primary questions with which we are presented[6] (both

---

[3] A search of the home was conducted pursuant to a warrant.

[4] Among other things, the evidence showed that the couple was having financial difficulties at the time of the robbery. An expert testified that around the time of the robbery, the defendants had low or negative balance in their bank accounts, owed more than $40,000 to the Lottery Commission, and had debt of approximately $115,000 associated with their gasoline station. The day after the robbery, Labadie used cash to purchase approximately $20,000 in money orders, some of which were used to pay the Lottery Commission. In addition, in the days leading up to the robbery, Labadie had expressed interest in purchasing expensive commercial donut-making equipment that he thought would increase business at the couple's gasoline station. He stated that he did not have the funds to make the purchase at that time. The machinery was bought after the robbery.

[5] Labadie was also convicted of attempted possession of counterfeit notes, G. L. c. 267, § 12, and G. L. c. 274, § 6; and possession of counterfeiting tools, G. L. c. 267, § 13. Carcieri was acquitted of these charges.

[6] Neither defendant raised these issues below, and only Carcieri argued them in her brief on appeal. Labadie adopted the arguments at oral argument and in postargument submissions. The failure to raise the arguments earlier does not preclude our consideration of them because "[j]urisdictional questions . . . may be raised at any time in the progress of the case, including at the appellate level." *Commonwealth* v. *Zawatsky*, 41 Mass. App. Ct. 392, 394 (1996).

raised first on appeal) are whether a Federal credit union is a "bank" for purposes of G. L. c. 266, § 52, and, if it is, whether the crime of embezzlement from a Federal credit union is within the exclusive jurisdiction of the Federal courts. We also consider Labadie's challenge to the sufficiency of the evidence supporting his counterfeiting convictions.

1. *Embezzlement from a Federal credit union.* The indictment charged Carcieri with violating G. L. c. 266, § 52, as "an employee of Wyman Gordon Federal Credit Union, [who] did fraudulently convert or fraudulently take and secrete with intent to do so, money belonging to such bank." Labadie was charged as a joint venturer in the same crime. General Laws c. 266, § 52, as amended by St. 1934, c. 270, § 3, provides:

> "An officer, director, trustee, agent or employee of a bank, *as defined in section one of chapter one hundred and sixty-seven,* who fraudulently converts, or fraudulently takes and secretes with intent so to do, any bullion, money, note, bill or other security for money which belongs to and is in possession of such bank, or which belongs to any person and is deposited therein, shall, whether intrusted with the custody thereof or not, be guilty of larceny from said bank."

(Emphasis added). As the emphasized language indicates, only thefts from banks that fall within the definition contained in G. L. c. 167, § 1, are subject to prosecution under the statute.

A "bank," as defined by G. L. c. 167, § 1, as amended by St. 2004, c. 461, § 1, is "any association or corporation chartered by the commonwealth under chapter 168, 170, 171 or 172, or an individual, association, partnership or corporation incorporated or doing a banking business in the commonwealth subject to the supervision of the [Commissioner of Banks (Commissioner)]." It is undisputed that Wyman Gordon is not chartered or incorporated by or in the Commonwealth; the undisputed evidence at trial was that Wyman Gordon was authorized under Federal law. There was also no evidence at trial that Wyman Gordon is under the oversight or supervision of State banking authorities. On this basis, the defendants argue that Wyman Gordon is not a "bank" within G. L. c. 167, § 1.

Although the Commonwealth acknowledges that Wyman Gordon is not chartered or incorporated by or in the Commonwealth, it argues that Federal credit unions generally (and therefore Wyman Gordon particularly) are within the purview of the Commissioner by virtue of 209 Code Mass. Regs. § 50.01 (2010) and, therefore, Wyman Gordon is a "bank" within the meaning of G. L. c. 167, § 1. Title 209 Code Mass. Regs. §§ 50.00 (2010) is entitled "Parity with Federal Credit Unions" and 209 Code Mass. Regs. § 50.01 provides:

> "The purpose of 209 [Code Mass. Regs. §§] 50.00 is to specify authorized powers and activities of credit unions, pursuant to [G. L.] c. 171, § 6A, and to establish procedures and requirements, applicable to credit unions seeking to exercise powers granted to or conduct activities authorized for federal credit unions under federal law, to the extent that such powers are not otherwise prohibited.

> "In determining whether or not to authorize any power or activity, the Commissioner shall also determine whether or not competition among credit unions will be unreasonably affected and whether public convenience and advantage will be promoted.

> "A credit union may, under [G. L.] c. 171, § 6A and 209 [Code Mass. Regs. §§] 50.00, exercise only those powers and engage in only those activities expressly authorized by the Commissioner as set forth in 209 [Code Mass. Regs. §§] 50.00. Powers and activities not so authorized are prohibited."

We see nothing in this regulation that subjects Federal credit unions to supervision by the Massachusetts Commissioner of Banks. Indeed, for purposes of the regulation, the term "credit union" is defined as one "chartered pursuant to [G. L.] c. 171 and subject to examination and supervision by the Commissioner under [G. L.] c. 167." 209 Mass. Code Regs. § 50.04 (2010).[7] Moreover, Federal credit unions are referred to in

---

[7] Federal credit unions are not chartered under G. L. c. 171; they are chartered under Federal law, see Federal Credit Union Act, 12 U.S.C. § 1751 (2006), and are under the authority and supervision of the National Credit Union Administration.

§ 50.01 only to identify the types of *non-Federal* credit unions that are subject to the regulation.

Even were we to assume that Federal credit unions are "banks" within the meaning of G. L. c. 167, § 1, the language and history of the embezzlement statute, G. L. c. 266, § 52, demonstrate that the Legislature did not intend to bring thefts from Federal credit unions within its reach. From 1825 through 1836, the statute applied only to embezzlements from banks incorporated within the Commonwealth.[8] The statute was amended in 1836 to extend to embezzlement from "any incorporated bank,"[9] and similar language was used in the 1860, 1892, 1902, and 1911 versions of the statute.[10] This amended language was "broad enough to include banking corporations organized under the laws of the United States and located in Massachusetts, as well as like corporations created by the laws of this state." *Commonwealth* v. *Felton,* 101 Mass. 204, 205 (1869), citing *Commonwealth* v. *Tenney,* 97 Mass. 50, 56 (1867). Although embezzlement from a national bank was within the broad language contained in the statute from 1825 until amended in 1922, see note 13, *infra,* the Supreme Judicial Court held that embezzlement from national banks was outside the jurisdiction of our State courts because Congress enacted its own act in 1864 making "full and ample provision for the punishment of the crime of embezzlement and fraudulent appropriation of any funds of a national bank by any cashier, &c., of such

---

[8]See St. 1824, c. 51 (enacted January 29, 1825) ("any cashier or other officer or servant of any Bank incorporated within this Commonwealth, for the purpose of issuing bills or notes, who shall embezzle or fraudulently convert to his own use, or fraudulently take or secrete, with intent to convert to his own use, any money . . . shall be deemed, in so doing, to have committed the crime of larceny"); St. 1828, c. 96, § 26 ("any President, Director, Cashier or other officer or servant of any Bank incorporated within this Commonwealth for the purpose of issuing bills, or notes, who shall embezzle or fraudulently convert to his own use, or fraudulently take or secrete . . . any money . . . belonging to said Bank . . . shall be deemed in so doing to have committed of the crime of larceny").

[9]Revised Statutes of 1836, c. 126, § 27, stated: "If any cashier or other officer, agent, or servant of any incorporated bank shall embezzle, or fraudulently convert to his own use, or shall fraudulently take or secrete . . . any . . . money . . . belonging to . . . such bank, . . . he shall be deemed, by doing so, to have committed larceny."

[10]See Gen. St. 1860, c. 161, § 39; Pub. St. 1882, c. 203, § 41; R.L. 1902, c. 208, § 44; St. 1911, c. 216, all of which specified embezzlement by "an officer of an incorporated bank."

bank."[11] *Id.* at 206.[12] Thus, although the language of our embezzlement statute was broad enough to encompass Federal banks, our case law made clear that application of the statute to Federal banks was outside our jurisdiction.

The United States Supreme Court reached a similar conclusion in 1903. In an opinion citing, among other cases, *Felton*, the Court held:

> "Undoubtedly a State has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction. So, likewise, it may declare, by special laws, certain acts to be criminal offences when committed by officers or agents of its own banks and institutions. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States."

*Easton* v. *Iowa*, 188 U.S. 220, 239 (1903). The criminal conviction at issue in that case (a Federal bank officer accepting funds knowing the bank to be insolvent) was accordingly reversed on preemption grounds.

Apparently acknowledging that Federal law preempts State prosecution of embezzlement from national banking institutions, the Legislature in 1922 amended G. L. c. 266, § 52, reducing its application from all incorporated banks to only those chartered by the Commonwealth or subject to supervision by the Commissioner.[13] G. L. c. 167, § 1. This narrowed scope has remained in the statute's language to this day.

In sum, we conclude that Wyman Gordon is not a "bank"

---

[11]*Felton* dealt with the predecessor to the modern Federal embezzlement statute. See 18 U.S.C. § 656 (2006).

[12]The analysis of *Felton* has been cited approvingly and followed in State and Federal jurisdictions that have considered the same issue with respect to other States' criminal statutes. See *United States* v. *Buskey*, 38 F. 99, 100-101 (E.D. Va. 1889); *In re Eno*, 54 F. 669, 670 (C.C.S.D.N.Y. 1893), reversed on other grounds, 155 U.S. 89 (1894); *People* v. *Fonda*, 62 Mich. 401, 407 (1886); *Martin* v. *State*, 61 S.W. 2d 999, 1000-1001 (Tex. Crim. App. 1933). See *Commonwealth* v. *Ketner*, 92 Pa. 372, 376-377 (1880).

[13]See St. 1922, c. 313, § 1, which provided: "An officer, director, trustee, agent or employee of a bank as defined in section one of chapter one hundred and sixty-seven, who fraudulently converts or fraudulently takes and secretes with intent to do so, any . . . money . . . which belongs to . . . such bank . . shall be guilty of larceny from said bank."

within the ambit of G. L. c. 266, § 52. Indeed, apart from the absence of any legislative intent to extend the statute's reach to that length, any construction of G. L. c. 266, § 52, purporting to extend the statute to embezzlement from national banks would be preempted by Federal law. *Easton* v. *Iowa*, 188 U.S. at 239. The crime of embezzlement (whether as a principal or a joint venturer) from a Federal bank is outside the jurisdiction of our courts. *Commonwealth* v. *Felton*, 101 Mass. at 206.

Although Federal law preempts a State prosecution for embezzlement from a Federal banking institution, the lesser included offense of larceny (as opposed to embezzlement) from a Federal bank is not preempted. See *Commonwealth* v. *Marsino*, 252 Mass. 224, 232 (1925); *People* v. *Cannon*, 194 A.D.2d 496, 497 (N.Y. 1993). For this reason, we have considered whether we might remand for entry of conviction on the lesser included offense. See *Commonwealth* v. *Mahoney*, 68 Mass. App. Ct. 561, 562 (2007). However, "[a] verdict or finding that is supported by the evidence but is rendered by a court without jurisdiction to try the offense cannot be transmuted into a verdict or a finding on a lesser included offense solely because the court had jurisdiction to try the lesser offense." Smith, Criminal Practice & Procedure § 2.1, at 34-35 (3d ed. 2007). See *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 287 (1995); *Commonwealth* v. *Zawatsky*, 41 Mass. App. Ct. 392, 397 n.6 (1996). That said, because the original convictions were nullities in light of the lack of jurisdiction, double jeopardy does not preclude retrial. *Commonwealth* v. *Lovett*, 374 Mass. 394, 397-398 (1978).

2. *Counterfeiting convictions.* Labadie argues that the evidence was insufficient to support his convictions of attempted possession of counterfeit notes and possession of counterfeiting tools. We consider the evidence in the light most favorable to the Commonwealth to determine whether a rational trier of fact could have found each element of the crimes beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979).

"[A] conviction of attempt under G. L. c. 274, § 6, requires 'an intention to commit the underlying offense, [and] also an overt act toward its commission.' " *Commonwealth* v. *Marzilli*, 457 Mass. 64, 66 (2010), quoting from *Commonwealth* v. *Ortiz*,

408 Mass. 463, 470 (1990). Possession of counterfeit notes under G. L. c. 267, § 12, amended by St. 1974, c. 369, § 4, requires possession of "false, forged or counterfeit bills or notes . . . with intent to utter or pass the same or to render the same current as true." Possession may be shown by proof that the defendant had knowledge of and the ability and intent to control the counterfeit notes. See *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989). The evidence supported a reasonable inference that Labadie used the computer seized from the defendants' home. The computer's hard drive contained several scanned images, including an advertisement for Labadie's roofing business, and the computer had been used to search for information about franchising donut and coffee shops. The hard drive contained scanned images of a portrait of Andrew Jackson from a Federal Reserve note, a ten-dollar note, the front and back of a new fifty-dollar note, and the front and back of a new twenty-dollar note. There were two eight-by-ten sheets of paper in the scanner with images of a ten-dollar bill aligned on a grid. An expert testified that the paper was "very close color to U.S. currency." Moreover, the computer had been used to visit the Web sites Google, Yahoo!, and Ask Jeeves to conduct searches including, "how to make counterfeit money," "how to counterfeit money," and "counterfeiting paper." The computer also showed visits to "moneyfactory.[gov]," which the expert testified is "the official website of the U.S. government of the Bureau of Engraving and Printing." The jury could reasonably infer that Labadie had used the computer to research counterfeiting and to try the process himself.

General Laws c. 267, § 13, as amended by St. 1974, c. 369, § 5, prohibits possession of any "tool, instrument or implement, . . . or . . . paper or other material adapted and designed for the forging or making of a false and counterfeit note, . . . with intent to use the same . . . in forging or making such false and counterfeit" notes. Labadie argues that the computer equipment seized from the defendants' home cannot constitute counterfeiting tools under this statute. We conclude that the computer, scanner, and printer constitute implements "adapted to and designed for" making counterfeit currency within the meaning of the statute. Although none of these items was

manufactured for the purpose of counterfeiting, they had been customized and integrated into a system for producing counterfeit notes, which was not the intended use of the products.[14] The computer operated Windows 98 and Microsoft Paint, software that could be used to manipulate images of currency. At trial, former Secret Service Agent Edward Bradstreet testified as an expert to the fact that most counterfeit money is produced with personal computers, scanners, and ink jet printers. He opined that counterfeiters take detailed scans of a bill, zooming in on the serial number, in order to capture detailed security features. The Windows 98 operating system provides a technical advantage to counterfeiters because Microsoft Paint, an image editing program, is built in. In addition, the computer's hard drive contained scanned images of Federal Reserve notes. The jury could reasonably infer that the scanner had been used to scan these images and that the printer was used to print the manipulated images on paper the color and consistency of United States currency. Additionally, as discussed above, there was sufficient evidence for the jury to infer that Labadie was the one who used the computer, scanner, and printer for these purposes.

3. *Conclusion.* Labadie's counterfeiting judgments are affirmed; the embezzlement judgments as to both defendants are reversed, the verdicts are set aside, and the cases are remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[14]Two other jurisdictions that have considered this question reached the same conclusion. See *State* v. *Boutte*, 27 So. 3d 312, 315-316 (La. App. 2009) (computer with printer and software designed to produce checks was implement " 'particularly suited' to produce the counterfeit instruments"); *People* v. *Harrison*, 283 Mich. App. 374, 379-380 (2009) (computer, scanner, and printer constituted tools "adapted or designed for the forging and making [of] . . . counterfeit note[s]"). As the Court of Appeals of Michigan recognized, "[u]sing an existing computer, scanner, and printer to counterfeit money involves modifying the normal intended uses of these tools to achieve the goal of creating counterfeit currency." *Id.* at 380.