NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-87                                           Appeals Court

COMMONWEALTH  vs.  LEANNE TREFRY.

No. 15-P-87.

Barnstable.     May 23, 2016. - June 15, 2016.

Present:  Katzmann, Maldonado, & Blake, JJ.

Dog.  Statute, Construction.


Complaint received and sworn to in the Orleans Division of
the District Court Department on August 9, 2013.

The case was heard by H. Gregory Williams, J.


Roderick S. Oreste for the defendant.
Elizabeth Anne Sweeney, Assistant District Attorney, for
the Commonwealth.


KATZMANN, J.  The defendant was convicted after a jury-

waived trial in District Court of two counts of violating a 2012

statute, G. L. c. 140, § 174E(f), which protects dogs from cruel

conditions and inhumane chaining or tethering.[1]  She now appeals,

challenging the sufficiency of the evidence.  In this case of

_____

[1] The defendant was acquitted of two counts of animal
cruelty in violation of G. L. c. 272, § 77.

first impression, which requires review of the reach of G. L. c. 140, § 174E, we conclude that subjecting a dog to cruel conditions suffices to establish a violation, and we reject the contention that outside confinement or confinement in general is an element required to convict under the statute. Accordingly, we affirm.

Background. After the defendant's house in Brewster (property) had been condemned in August, 2012, and she had moved into a nursing home, her two Shetland sheepdogs, Zach and Kenji, remained on the property, where they had access to the inside of the condemned house and a fenced-in yard.

Although the defendant herself was present on the property at least intermittently even after the house had been condemned, and she had occasional assistance from friends, the dogs were effectively left alone on the property, which was clogged with trash inside and out, emitted odors of trash (inside) and dog feces (outside), and contained numerous items that would pose a danger to the dogs' health and safety. Neighbors, animal control officers, and police officers observed the deplorable conditions to which Kenji and Zach were subjected.

On July 25, 2013, an animal control officer who had been working with the defendant saw that Kenji was limping badly and appeared to be in pain. He was taken to a veterinarian, and both dogs were removed from the property three days later.

Discussion.  The defendant's primary contention on appeal
is that G. L. c. 140, § 174E, inserted by St. 2012, c. 193,
§ 48, is inapplicable where there is no evidence that the dogs
were confined outside.[2]  We agree with the trial judge, however,
that this argument ignores subsection (f) of the statute, which
provides as follows:

> "No person owning or keeping a dog shall subject the dog to
> cruel conditions or inhumane chaining or the tethering at
> any time.  For the purposes of this subsection, 'cruel
> conditions and inhumane chaining or tethering' shall
> include, but not be limited to, the following conditions:
>
> "(1) filthy and dirty confinement conditions including, but
> not limited to, exposure to excessive animal waste,
> garbage, dirty water, noxious odors, dangerous objects that
> could injure or kill a dog upon contact or other
> circumstances that could cause harm to a dog's physical or
> emotional health;
>
> "(2) taunting, prodding, hitting, harassing, threatening or
> otherwise harming a tethered or confined dog; and
>
> "(3) subjecting a dog to dangerous conditions, including
> attacks by other animals."

G. L. c. 140, § 174E(f).

---

[2] We note that the defendant's argument at trial with
respect to these charges in support of her motion for a required
finding of not guilty appears to have been based in part on the
caption of the statute ("Chaining or tethering dog to stationary
object; confinement; restrictions; penalty") as opposed to the
text of the statute itself.  However, "[t]he title to an act
cannot control the plain provisions of the statute, although it
may be a guide to resolving an ambiguity in the legislation."
Breault v. Ford Motor Co., 364 Mass. 352, 353 n.2 (1973).  As
shall be discussed infra, here, as in Breault, there is no
ambiguity.

The statute unambiguously sets out the prohibitions on "cruel conditions," "inhumane chaining," and "the tethering"[3] in the disjunctive as alternative means of violating the statute. See Commonwealth v. Rodriguez, 83 Mass. App. Ct. 267, 270 (2013) (use of word "or," "presumed to be disjunctive," "sets out two alternative ways of committing the crime").

The plain meaning of the statute does not support the defendant's narrow reading that outside confinement or, indeed, confinement in general, is an element of the subjecting of dogs to cruel conditions that is prohibited by this subsection. See Commonwealth v. Gopaul, 86 Mass. App. Ct. 685, 687 (2014) ("As with all matters of statutory interpretation, we look first to the plain meaning of the statutory language. Where the language of a statute is plain and unambiguous, it is conclusive as to legislative intent" [quotations omitted]). "[F]ilthy and dirty confinement" under § 174E(f)(1) is but one example of the kind of cruel conditions that are prohibited. In addition, § 174E(f)(3)'s prohibition against subjecting dogs to dangerous conditions is made, in contrast to § 174E(f)(1) and § 174E(f)(2), without any reference to confinement or tethering.

Furthermore, if subjecting a dog to "cruel conditions" as set forth in § 174E(f) was not on its own sufficient to

---

[3] The reference to "the" before "tethering" may be an allusion to the first appearance of "tethering" in an earlier paragraph of the statute, G. L. c. 140, § 174E(a).

establish liability -- in the absence of chaining or tethering or some other means of confinement -- then such an interpretation would render impermissibly superfluous the inclusion of "confinement" in § 174E(f)(1) and "tethered or confined" in § 174E(f)(2).  See Arthur D. Little, Inc. v. Commissioner of Health & Hosps. of Cambridge, 395 Mass. 535, 541 (1985) ("[W]here the Legislature has employed specific language in one [portion of a statute], but not in another, the language should not be implied where it is not present" [quotation omitted]); Commonwealth v. Millican, 449 Mass. 298, 300 (2007) ("None of the words of a statute is to be regarded as superfluous" [quotation omitted]); Commonwealth v. Perella, 464 Mass. 274, 280 (2013) ("were we to interpret 'indictment' as implicitly incorporating 'complaint' in the first, fourth, and fifth sentences of [G. L. c. 277,] § 63, the two explicit references to 'complaint' in the second sentence would be rendered impermissibly superfluous").

The switch from the disjunctive to a combination of the conjunctive and the disjunctive in the preamble to the nonexhaustive list[4] does not alter our analysis, as it merely reflects § 174E's consistent equation of "chaining" and

---

[4] As set forth supra, § 174E(f) provides, "No person owning or keeping a dog shall subject the dog to cruel conditions or inhumane chaining or the tethering at any time" -- is followed by a nonexhaustive list of what constitutes "cruel conditions and inhumane chaining or tethering" (emphasis added).

"tethering."  See G. L. c. 140, § 174E(a) (twice referring to "chain or tether"); G. L. c. 140, § 174E(d) ("chained or tethered").  In effect, then, the Legislature is simply providing examples of situations that are violative of the statute as either cruel conditions or inhumane tethering or chaining, a list that includes examples where dogs are confined (§ 174E[f][1] and [2]), and examples where they are not (§ 174E[f][3]).

There is also no merit to the defendant's contention that her construction is supported by reading the statute as a whole. In fact, reading § 174E as a whole suggests that subsection (f) is indeed different from the preceding subsections and that subsection (e), which sets out an exception "to the above restrictions on outdoor confinement," is the dividing line between subsections devoted to outdoor confinement and one addressed more generally to the conditions in which dogs are kept.

Nor is the defendant's construction required by prior case law.  General Laws c. 140, § 174E, is relatively new, effective only since October 31, 2012.  In fact, only one published opinion in the Commonwealth has discussed it.  In Commonwealth v. Duncan, 467 Mass. 746, 752, cert. denied, 135 S. Ct. 224 (2014), the Supreme Judicial Court included G. L. c. 140, § 174E, in its survey of statutes collectively evincing a

"public policy promoting the humane treatment of animals." The court observed that in enacting G. L. c. 140, § 174E, "the Legislature took steps to protect dogs in particular, by prescribing the duration and conditions under which they may be restrained outside," and noted that the statute requires, among other things, "that dogs confined outside be provided with clean water and appropriate shelter." Id. at 751.

The defendant contends that the Supreme Judicial Court's treatment of the statute in Duncan indicates that it only applies to those circumstances where a dog is kept exclusively outside. Indeed, in further discussing the role of G. L. c. 140, § 174E, in the "legislative framework for preventing cruelty to animals," the court focused on "the provision regulating the conditions under which dogs may be kept outside." Id. at 752.

But Duncan's references to G. L. c. 140, § 174E, "amount[] to dicta, because the elements of the crime were not at issue in that case." Rodriguez, 83 Mass. App. Ct. at 271. Moreover, given that the bulk of G. L. c. 140, § 174E, addresses tethered dogs and dogs confined outside, we do not take the Duncan court's focus on that aspect of the section as any indication that the broader prohibitions contained in subsection (f) are limited to situations in which dogs are chained outdoors. Even so, the Duncan court also referenced the statute's authorization

of prosecutions against "dog owners" who expose "their dogs to conditions that 'could injure or kill [them]' in ill-equipped yards, G. L. c. 140, § 174E(f)(1)." Duncan, 467 Mass. at 752. The court did not state that the dogs had to be confined to those yards in order to trigger the statute's protection, nor would it be sensible to impose such a requirement where the safety of dogs is imperiled even by an ill-equipped yard to which they have access but in which they are not confined. The defendant's conviction here is fully consistent with the court's citation to subsection (f) and the dangers faced by dogs in "ill-equipped yards."

We are also unpersuaded by the defendant's argument that taking the words of the statute at their plain meaning brings G. L. c. 140, § 174E(f), into conflict with the overlapping coverage of the animal cruelty statute, G. L. c. 272, § 77, prohibiting those who have charge or custody of an animal from, inter alia, inflicting unnecessary cruelty on the animal, unnecessarily failing to provide the animal with a proper sanitary environment, wilfully abandoning the animal, or knowingly and wilfully authorizing or permitting the animal to be subjected to unnecessary suffering or cruelty of any kind. There is no merit to the defendant's suggestion that the animal cruelty statute only regulates conditions for animals confined indoors, such that § 174E(f) should only apply to dogs confined

outdoors.  Commonwealth v. Erickson, 74 Mass. App. Ct. 172 (2009), on which the defendant relies, in no way indicates that the animal cruelty statute's scope is so limited, and such a reading finds no support in the plain language of the broadly worded statute.  Thus, even if we accepted the defendant's reading of G. L. c. 140, § 174E(f), it would not eliminate her claimed overlap with the animal cruelty statute, as overlap would remain with respect to those cases where a confined or tethered dog is subjected to conditions that would violate both G. L. c. 140, § 174E(f), and G. L. c. 272, § 77.[5]

Moreover, no disharmony or inconsistency automatically arises from overlapping statutory coverage, especially where one statute establishes a felony and another establishes a misdemeanor.[6]  As we noted in Erickson, 74 Mass. App. Ct. at 176, a "heightened mental state of 'knowing' and 'willful' conduct was included by the Legislature" in portions of the animal cruelty statute.  Even where the animal cruelty statute requires only general intent, id. at 176-177, it is directed at intentional conduct.  Cf. Duncan, 467 Mass. at 751 (observing

---

[5] The defendant's theory would also deprive animals other than dogs who are confined outdoors of the protections of the animal cruelty statute even though they are ineligible for the dog-specific protections of G. L. c. 140, § 174E.

[6] Neither party has contended that G. L. c. 140, § 174E(f), establishes only a civil infraction, and the judge treated the charges as criminal offenses.  We do the same.

that "[o]ur statutes evince a focus on the prevention of both
intentional and neglectful animal cruelty" and citing G. L.
c. 272, § 77, and G. L. c. 140, § 174E [emphasis added]).  In
fact, no mental state is explicitly required under subsection
(f), and offenders are not at risk of imprisonment.[7]  Cf.
Commonwealth v. Belanger, 30 Mass. App. Ct. 31, 33 (1991) ("When
statutes impose punishment out of considerations of public
policy, lack of knowledge of the law or of the fact that the law
has been violated does not exonerate the person who may have
unwittingly violated the statute. . . .  Transgressions of that
sort of statute have been described as 'public welfare' or
'strict liability' offenses").

　　　Suffice it to say that with respect to § 174E, the
Legislature could reasonably decide that it wished to empower
law enforcement officials in some circumstances to intervene on
behalf of dogs in particular without resorting to a felony
prosecution, and a lesser mens rea would be consistent with that
objective.  See Commonwealth v. Fitta, 391 Mass. 394, 396-397

---

[7] General Laws c. 140, § 174E(g), provides as follows:

"A person who violates this section shall, for a first
offense, be issued a written warning or punished by a fine
of not more than $50, for a second offense, be punished by
a fine of not more than $100 and for a third or subsequent
offense, be punished by a fine of not more than $300, and
be subject to impoundment of the dog in a local shelter at
the owner's or guardian's expense pending compliance with
this section, or loss of ownership of the dog."

(1984) (rejecting defendant's argument that felony "open and gross lewdness and lascivious behavior" statute impermissibly overlaps with misdemeanor "indecent exposure" statute because felony requires proof of element not required for misdemeanor); Commonwealth v. Kessler, 442 Mass. 770, 774 (2004) (same).  This was essentially the distinction drawn by the judge here in finding the defendant guilty of G. L. c. 140, § 174E(f), but not the animal cruelty statute, believing the latter to require conduct that was "much more egregious than what we've seen here."[8]

Viewing the evidence and the permissible inferences to be drawn therefrom in the light most favorable to the Commonwealth, Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979), we are satisfied that the evidence at trial was more than sufficient to support the judge's finding that the defendant subjected her dogs to cruel conditions in this case.  By the time they were removed, a neighbor described the dogs as "ravaged" and "traumatized."  They were "incredibly tick-infested"[9] and "matted," and Kenji had contracted Lyme disease and sustained a soft shoulder injury to his leg that left him limping.  Although

---

[8] We express no opinion whether the evidence was sufficient to support the animal cruelty charges, of which defendant was acquitted by the judge.

[9] The defendant's neighbor testified that in July, 2013, she picked more than thirty ticks off the dogs and that the ticks "were the size of [her] fingernails and bigger."

the intervention of animal control led to Kenji's diagnosis and the prescription of antibiotics and pain medication, because the defendant was unable to administer the medication herself and had not found anyone to do it for her, Kenji did not receive any of his prescribed pills. They remained unopened in the condemned home.

The evidence was more than sufficient to establish that the dogs were subjected to "dangerous conditions" in violation of § 174E(f)(3). Linda Brogden-Burns, Brewster's animal control officer, testified that the defendant's house was overgrown on the outside and so cluttered with boxes, books, and clothing on the inside that it was difficult to walk. A box in the house had both an open container of old dog food and knives. Brogden-Burns noted that the yard was overgrown and that there were metal parts, old lawn equipment, stools, and stacks of chairs by the back door. There was stagnant water in bowls. Brogden-Burns was specifically concerned about items in the yard that posed a danger to the animals, including wires, shovels, and other items that could fall on or otherwise hurt them.

The judge could have inferred that the condition of the house did not improve between the condemnation and the removal of the dogs nearly a year later. Brogden-Burns's observations of the inside of the house were consistent from her first inspection in December, 2012, through subsequent visits in

March, 2013.[10]  Although there was testimony that there were temporary improvements to the yard area, Nancy Ellis-Ice, the director of Brewster's health department, testified that the condition of the house was the same in April, 2013, as it had been when it was condemned the previous August.

In addition, although we do not read the statute as requiring confinement generally, to the extent that "filthy and dirty confinement" under § 174E(f)(1) was the specific example of "cruel conditions" on which the judge focused, there was also sufficient evidence under Latimore for the judge to infer that, while the dogs could move in and out of the condemned house by means of a broken latch on the back door, the dogs were in fact confined to the defendant's house and fenced-in yard.  There was overwhelming evidence that the area to which the dogs were confined presented with every factor listed in § 174E(f)(1) as constituting "filthy and dirty" conditions.  Retired Brewster police Sergeant Steven Freiner testified that, as of April, 2013, there was a large amount of debris and trash inside and outside the house as well as a foul smell of trash coming from inside the house.  Allen Borgal, a lieutenant with the Animal Rescue League of Boston and director of the Center for Animal

---

[10] Brogden-Burns documented her December, 2012, inspection and follow-up visits in April and July, 2013, with photographs that were admitted in evidence.  At least some of these photographs were transmitted to this court and considered in the resolution of this appeal.

Protection, reported that the yard was overgrown, that no dog feces had been picked up, and that the yard consequently smelled like dog feces when he visited the property in July, 2013. Brogden-Burns noted the generally filthy and dirty conditions in the yard. In addition, Zach's and Kenji's emotional health was further compromised by being left alone virtually all day every day.

Judgments affirmed.