**UNITED STATES of America, Appellee,**

v.

**Morton JACOBS and Irving Spieler, Defendants-Appellants.**

**Nos. 495, 496, Dockets 33885, 34369.**

United States Court of Appeals, Second Circuit.

Argued Jan. 12, 1970.

Decided Aug. 24, 1970.

Edward M. Shaw, Paul B. Galvani, Asst.U.S.Attys., Robert M. Morgenthau, U.S.Atty., for appellee.

Daniel H. Greenberg, New York City, for appellant Jacobs.

Irving L. Weinberger, Moses Polakoff, New York City, for appellant Spieler.

Before MEDINA, WATERMAN and SMITH, Circuit Judges.

**WATERMAN, Circuit Judge:**

Codefendants, Jacobs and Spieler, were charged, first, with conspiring to bribe an Internal Revenue Service agent to influence an IRS investigation and so to obstruct justice in violation of 18 U.S.C. §§ 201, 1503 (18 U.S.C. §§ 371, 2), and, second, with offering a bribe to the agent, 18 U.S.C. § 201.[1]

They were tried to a jury which returned verdicts of guilty against both defendants on both counts. Jacobs received concurrent sentences of one year on each count. Spieler was given suspended concurrent one-year prison terms and placed on probation for one year. Jacobs was released on his own recognizance pending the outcome of this appeal.

On appeal from the judgments of conviction they both advance the following claims: (1) the evidence was insufficient to convict them for attempted bribery or for conspiracy to bribe; (2) certain portions of the court's charge to the jury constituted reversible error; and (3) the use, without first having obtained a warrant authorizing the use, of electronic transmitting and recording equipment to overhear and record conversations violated their rights under the Fourth Amendment. In addition, appellant Spieler contends that he was a victim of a government plan of entrapment, and,

also, that the court improperly denied his motion for a new trial predicated on "newly discovered evidence." We affirm both convictions.

The fateful progression of events and circumstances that ultimately led to appellants' indictments began in 1966 when the Regional Inspector's Office of the Internal Revenue Service in New York City undertook an investigation into an alleged attempt by a Martin Siegel and a Harold Adler to bribe a Revenue Agent, Gerald Stone, in connection with an audit of the 1964 and 1965 federal income tax returns of television comedian Alan King. Siegel, who served as King's accountant, and Adler, who was a theatrical agent for King, were subsequently indicted by a grand jury in mid-1967. Appellant Spieler, an attorney, represented Siegel in that grand jury proceeding. Appellant Jacobs, a businessman working in Manhattan, was a friend of and sometimes a lender of money to Spieler. Brian Bruh, a Special Agent of the IRS Intelligence Division, who was the Government's principal witness at the Jacobs and Spieler trial, completes the cast of characters. Agent Bruh was friendly with Jacobs. They had lived near each other in Brooklyn and Bruh had occasionally commuted in Jacob's car to and from work with Jacobs.

On April 4, 1967, Jacobs telephoned Agent Bruh and asked Bruh to meet him at his office the following morning. Bruh complied, and thus began a series of meetings between the two.

The jury found that the Government had proved beyond a reasonable doubt that the objective which Jacobs and Spie-

---

1. In addition, the indictment charged Spieler with four counts of perjury before a grand jury in violation of 18 U.S.C. § 1621, but these counts were severed before trial.

Section 201 provides in relevant part:

\* \* \* \* \*

(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official \* \* \* with intent—

(1) to influence any official act; or

(2) to influence such public official \* \* \* to commit or aid in committing,

or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(3) to induce such public official \* \* \* to do or omit to do any act in violation of his lawful duty \* \* \* [commits a crime].

Section 1503 provides in relevant part:

Whoever \* \* \* corruptly \* \* \* influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice \* \* \* [commits a crime].

ler sought to attain by contacting Bruh was to arrange a way to get Martin Siegel out of trouble with the law by enlisting the efforts of Bruh to that end and by the strategic placement of bribe monies to be raised through the efforts of Jacobs and Spieler. The story is best unfolded by relating the substance of what occurred during each of the meetings.

*The Meetings of April 5 between Jacobs and Agent Bruh*

Jacobs explained his purpose for wanting to meet with Bruh by saying that Jacobs's attorney and long-time friend had given him a description of an agent handling a case of bribery against Martin Siegel. Jacobs was positive the described agent was Brian Bruh, and further related (according to Bruh's recollection at trial) that:

> * * * his attorney had asked him if he [Jacobs] knew anyone over at 120 Church Street well enough to talk to, there would be a lot of money in it for that person if he could present a case on Siegel favorably, thereby it would go easier on Siegel.

Bruh asked Jacobs if he realized the seriousness of what he was proposing, but Jacobs replied that he did not regard anything about their discussion as illegal, that he considered Bruh his friend, and that he would report to his attorney that Bruh "just wasn't interested." Bruh left.

The matter did not end there, however, for Bruh, after having talked the situation over with his supervisor and after having reported the conversation to the Internal Revenue Inspection Service, returned to Jacobs's office that afternoon. Upon seeing Bruh, Jacobs expressed the hope that Bruh was not upset by the morning's discussion and said, as if coaxing were needed, that he knew that Bruh was interested in buying a house and

"here was a chance * * * to make a lot of money." After Jacobs asked him if he were "really interested," Bruh replied that he would be, but first wanted to know what he was expected to do and how much was being offered for his help. Jacobs then dialed a telephone number and left word for a "Mr. Spieler" to return his call. Before Bruh left Jacobs told him the name of the attorney involved was Irving Spieler and that he would be in touch with Bruh again after he had talked with Spieler.

*The Meeting of April 11 between Jacobs and Bruh*

Prior to proceeding to Jacobs's office for another meeting Agent Bruh was equipped with a transmitting and recording device concealed on his person for the purpose of recording what might be said.[2] After some preliminary conversation, Jacobs said, "Spieler would like to know if Siegel was going to be indicted, and, if he was, he would like the indictment quashed." Jacobs then explained that Bruh could "perpetrate a fraud" on Siegel and Spieler by "getting $5,000 as a fee in advance and then, if the Government voluntarily decides not to indict Siegel, [Bruh] could always say that [he] killed the indictment and keep the money." Bruh replied by asking if $5,000 was what was being offered. Jacobs said that he had not as yet discussed the amount of the offer with Spieler, but that Bruh "could name [his] own price." Jacobs also told Bruh that Jacobs would be the one to transfer the money because Spieler "trusted him completely." Bruh was then assured that he would receive his money in advance and that Spieler would be the one to put up the money. Jacobs suggested that Bruh familiarize himself with Siegel's file and "determine how an indictment could be stopped." As a parting word Jacobs cautioned, "Be careful and don't get into trouble."

---

**2.** The transcript of the recording of the April 11 conversation between Jacobs and Agent Bruh was supplied to the defense but was not offered into evidence by either the Government or the defendants. The substance of the meeting, however, was provided at trial by the testimony of Bruh.

*The Meeting of April 18 between Jacobs and Bruh*

Agent Bruh was again outfitted with electronic eavesdropping devices and went to Jacobs's office.[3] Jacobs informed Bruh that he had talked with Spieler and that Spieler wanted Bruh's opinion. Bruh said that there was "a definite case" against Siegel, that he knew the IRS inspector handling the investigation, and because "it involves another fellow," $5,000 would not be enough. Bruh wanted to know what amount Spieler would be willing to offer and whether he should go ahead and contact the investigator handling the case. Jacobs then tried several times to reach Spieler on the phone to get answers to Bruh's questions, but Spieler's line was busy. Before Bruh left Jacobs told him not to do anything until he received further instructions.

*The Meeting of April 20 between Jacobs and Bruh*

Armed with electronic transmitting devices, Bruh met with Jacobs at his office again. This time Jacobs explained that he had discussed with Spieler the amount required for Bruh's cooperation and that Spieler had told him to start negotiations with $5,000.[4] Bruh replied that $5,000 "doesn't even sound like it's in the ballpark." Jacobs also explained

that Spieler was extremely reluctant to meet Bruh or to become directly involved with the agent. Bruh indicated he was unhappy with Spieler's supposed unwillingness to "get involved" and that he felt Spieler was "holding back information." Jacobs agreed to report Bruh's comments to Spieler.

*The Meeting of April 26 between Jacobs and Bruh*

At this meeting, held at Jacobs's office, and again monitored and recorded on surveillance equipment, Jacobs reported to Bruh that Spieler had said, when told that $5,000 would not be enough: "Well, ask the man how much he wants for the mortgage, that's all, and we'll see whether we can raise that kind of money." Bruh then told Jacobs he wanted to meet with Spieler. Jacobs agreed to arrange it and said he would tell Spieler "It's coming to a head now. Something has got to be done now."

*The Final Meeting of May 5 between Spieler, Jacobs and Bruh*

At this meeting, "bugged" as before, Bruh was introduced to Spieler at Jacobs's office. Jacobs began the relevant conversation by saying, "This guy can not raise any mortgage of that kind." Spieler then said, "That's the point. I don't think he can raise anything." Af-

---

3. The transcript of the recording of this meeting, and the transcripts of recordings made at subsequent meetings of April 20, 26, and May 5 (see *infra*) were offered and received in evidence over defense objections and after the denial of defense motions to suppress. In addition, Bruh testified as to his recollection of the conversations at these meetings.

4. The transcript of the transmitted and recorded conversation at the meeting on April 20 reveals the following:
   Bruh: How much money?
   \*       \*       \*       \*       \*
   Jacobs: He [Spieler] said start with 5.
   Bruh: Thousand?
   Jacobs: Yeah, start with 5, then you can make a countup, they can say they want 10, they want 50 or 100 but you gotta start someplace \* \* \*.

\*       \*       \*       \*       \*
Bruh: \* \* \* According to Spieler, now Spieler says that the only thing in question now is the price. I mean he wants me to go ahead and try to kill any case against Siegel.

Jacobs: Yeah. Put it this way; they want it taken care of whether the price is satisfactory, I couldn't tell you. Now the only way to begin to know is that you've got to find and he hasn't had a chance and he won't be able to until Monday but he feels right now that that will do it. 5 grand, he feels that will be all right. And I think myself, and I'm just here purely as an inbetween Agent I don't, I'll ask that's all. He says make the offer and the most that can happen is they're gonna come back with a counteroffer and that was it.

ter further discussion about Siegel's financial difficulties and the possibility that Siegel could turn to those with whom he had been associated (King or Adler) for the necessary funds, Bruh told Jacobs he wanted to talk with Spieler in private. Jacobs complied by going to another part of his office. Bruh then declared, "Morty [Jacobs] told me that you told him that Siegel was willing to pay $5,000." According to Bruh's testimony, Spieler nodded his head affirmatively and said in a low voice, "Yes. Then he [Siegel] said he had to borrow it."[5] Bruh again made it clear that the figure would have to be "much higher than $5,000" and Spieler promised to talk with Siegel and get back to Bruh. After more incidental conversation Spieler left. Before Bruh departed, Jacobs and Bruh agreed that nothing would be done on the case until money was forthcoming.

No meetings followed, and Bruh was unsuccessful in subsequent attempts to reach Spieler by phone. On May 24, when Bruh called for the last time, he was advised by a female voice, "Mr. Spieler says he is not interested."

At the trial Spieler testified in his own behalf. Jacobs did not take the stand. Spieler denied instructing Jacobs to solicit Bruh's assistance in the Siegel matter and explained that his conversations on May 5 with Bruh, whom he said he met by accident while visiting Jacobs to borrow money, were solely calculated to discourage Bruh from continuing his attempts to be paid a bribe.

We now turn to a discussion of the claims of prejudicial error.

## I.

Appellants' challenge to the sufficiency of the evidence to convict them of attempted bribery rests on their contention that they never got beyond the stage of preparation to commit the offense and never made the alleged attempt. We do not agree.

To begin with, as was said in United States v. Manton, 107 F.2d 834, 839 (2 Cir. 1938), cert. denied, 309 U.S. 664, 60 S.Ct. 590, 84 L.Ed. 1012 (1940), "We must take that view of the evidence most favorable to the government and sustain the verdict of the jury if there be substantial evidence to support it. Hodge v. United States, 6 Cir., 13 F.2d 596; Fitzgerald v. United States, 6 Cir., 29 F.2d 881." See, e.g., United States v. Dardi. 330 F.2d 316, 325 (2 Cir.), cert. denied, 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964); United States v. Tutino, 269 F. 2d 488, 490 (2 Cir. 1959).

The evil sought to be prevented by the deterrent effect of 18 U.S.C. § 201(b) is the aftermath suffered by the public when an official is corrupted and thereby perfidiously fails to perform his public service and duty. Thus the purpose of the statute is to discourage one from seeking an advantage by attempting to influence a public official to depart from conduct deemed essential to the public interest. As Judge Hastie aptly stated in United States v. Labovitz, 251 F.2d 393, 394 (3 Cir. 1958):

> It is a major concern of organized society that the community have the benefit of objective evaluation and unbiased judgment on the part of those who participate in the making of official decisions. Therefore, society deals sternly with bribery which would substitute the will of an interested person for the judgment of a public official as the controlling factor in official decision.

It therefore follows that Section 201(b) is violated even though the official offered a bribe is not corrupted, or the object of the bribe could not be attained, or it

---

5. The recording of this portion of the conversation did not pick up Spieler's "Yes," but did record, "Then he said he had to borrow it."

Spieler further explained Siegel's reluctance or inability to raise "mortgage" money as follows:

Spieler: I said [to Siegel] I think I can save you. If I can't, I can't. But when I start talking about mortgage money, he almost collapsed right here on 60 Broadway. He started telling me he hasn't got this, he hasn't got that. * * *

could make no difference if after the act were done it turned out that there had been actually no occasion to seek to influence any official conduct. See, e.g., Kemler v. United States, 133 F.2d 235, 238 (1 Cir. 1943).

■■■ It is also perfectly plain that the crime is consummated irrespective of whether an offer of an amount of money to influence an official's behavior is accepted by the official. Here the fact that Agent Bruh at the April 20 meeting between Jacobs and Bruh held out for more than $5,000 offered him has no bearing upon whether the offerors violated 18 U.S.C. § 201(b). It is also immaterial that Jacobs and Spieler were thwarted in their efforts to raise any money at all to pass on to Bruh. The crime was completed when Jacobs expressed an ability and a desire to pay Bruh $5,000 at their April 20 meeting. Jacobs was speaking for himself but he also was acting as Spieler's spokesman. This became abundantly clear by Spieler's admissions at the meeting of May 5 (see note 5 and accompanying text *supra*). The jury could well have found that Jacobs's statement of April 20 that Spieler had told him to "start with 5," (see note 4 *supra*) was a clearly expressed "opener" to Bruh that Jacobs *and* Spieler were ready, willing and able to close the deal at that amount, and was a statement designed to influence Bruh to accept $5,000 as a bribe for disposing of the case against Siegel.

Appellants also claim that inasmuch as Bruh was told not to go ahead with any efforts to help Siegel out of difficulty until the amount of the bribe was determined and he had received the money, Bruh's official behavior was not influenced, nor could it have been influenced until these preliminary negotiations were settled, an agreement reached, and the money paid. This precautionary advice to Bruh, however, does not negate the guilt of the defendants. The statute makes *attempted* bribery a crime, and so long as a bribe is "offered or promised" with the requisite intent "to influence *any* official act" the crime is committed. "Criminality does not get rid of its evil quality by the precautions it takes against consequences, personal or pecuniary. * * * Guilt is incurred by the trial— success may aggravate, it is not a condition of it." United States v. Russell, 255 U.S. 138, 143, 41 S.Ct. 260, 261, 65 L.Ed. 553 (1921).

As for the claim that, considered separately from the evidence adduced applicable to the substantive count, there is *insufficient evidence to sustain the* convictions on the conspiracy count, it suffices to say that Bruh's testimony and the evidence contained in the transcripts of the recordings of the last four meetings, if accepted as true, overwhelmingly establish that the defendants had entered into a criminal agreement to bribe a government official and to obstruct justice.[6]

### II.

Appellants contend that the court's charge to the jury and a supplemental charge were erroneous in a number of respects. We find no merit in any of these contentions and discuss but two of them, and those two but briefly.

■■■ First, appellants claim that it was error for the court to refuse to include within its charge an instruction at Jacobs's request to the effect that the

---

6. An example of Jacobs's and Spieler's complicity in an agreement to bribe Bruh when viewed against the evidence as a whole is found in their conversation of May 5.

    Jacobs: Right now something can be done baby. It can be nailed for him [Siegel].

    Spieler: What I'll do is *every now* and then he calls me, see what I'll do, I'll call him back and say I got a message. I didn't get a message. I'll say I understand you called me. I know he asked me to come down here and I'll feel him out. He's really stupid, between you, me, and the lamppost. I break my back to get extra insurance.

    Jacobs: Right now sure.

    Bruh: He's got a lot to lose.

    Jacobs: To prevent something right now is the time.

The record is replete with such examples.

jury could not find that a defendant was a co-conspirator solely on the assertions of another co-conspirator.[7] The court's omission of the requested instruction was not error, however, for its instruction relating to the jury's duty with reference to ascertaining each defendant's membership in a conspiracy was all that was legally required under the facts of the case. The judge instructed:

[W]hether or not a defendant was a member of the conspiracy must be determined upon the evidence that you have heard as to his own actions, his own conduct, his own statements and declarations, his own connection with the acts and conduct of the other alleged co-conspirators.

You may, in addition, consider and weigh the acts and declarations of the other co-conspirators bearing on the question of a defendant's membership in the conspiracy.

* * * In short, whether or not a defendant was a member of the conspiracy may be determined upon the reasonable inferences to be drawn from all the evidence in the case, including the evidence that you have heard as to his own actions, his own conduct, his own connection with the acts and conduct of the other alleged co-conspirator.

As we recently stated in United States v. Baker, 419 F.2d 83, 88–89 (2 Cir. 1969):

[I]n a conspiracy case the court must make a preliminary determination whether, if the testimony of the government witnesses is accepted as true, each defendant's own acts and statements show a connection with the conspiracy sufficient to justify the admission of the acts and statements of co-conspirators against him. (Citing cases) * * *. Once the judge has made such a determination, * * * the jury may consider the acts and declarations of co-conspirators made in furtherance of the common scheme in determining whether the elements of the crime of conspiracy, including purposeful entry into the conspiracy, are present.

See also United States v. Lopez, 420 F.2d 313, 317–318 (2 Cir. 1969); United States v. Geaney, 417 F.2d 1116 (2 Cir. 1969). We hold that on the basis of the evidence that had been presented in the case the judge's charge sufficiently apprised the jury of its fact-finding function.[8]

■ Second, the appellants contend that a supplementary unobjected-to instruction given to the jury after their deliberations had started was so erroneously prejudicial to their case as to be

---

7. The request is as follows:

In deliberating on this question of each defendant's knowing participation or membership in the conspiracy, you must consider the evidence as to each defendant individually. You must confine your deliberations to the independent evidence as to his own actions, his own conduct, his own statements or declarations, and the reasonable inferences to be drawn from such independent evidence. You may not base your decision as to whether or not he was a member of the conspiracy on evidence consisting only of the conduct or statements of other defendants or co-conspirators made in his absence.

8. Upon the completion of the court's main charge, counsel on both sides agreed that the jury could well be further instructed

as to the law relative to the proof of membership in a two-man conspiracy, the conspiracy the Government had the burden of establishing here. The language of the added instruction was agreed upon by all counsel, and the court then read to the jury the following agreed-upon instruction, which was repeated a second time at the request of a juror.

To be absolutely clear on the facts of this case, there is no conspiracy, and neither Jacobs nor Spieler can be found to be a member of a conspiracy unless and until you find beyond a reasonable doubt that both Jacobs and Spieler were members of the conspiracy. Accordingly, neither the words nor the acts of either Jacobs or Spieler are chargeable to the other unless and until both of them have gotten together with each other in the conspiracy charged.

"plain error". (Fed.R.Crim.P. 52). The instruction was given in response to a note from the jury requesting the judge to explain "what constitutes a conspiracy and what does not constitute a conspiracy." Despite Fed.R.Crim.P. 30, appellants attack the supplemental charge. They attack it as "long, bizarre, rambling, incomprehensible and thoroughly confusing," as "tortured," and as being an "emotional tirade." The court is accused of "haranguing" the jury with "wholly irrelevant and meaningless carryings-on," which resulted in leaving the jury "helpless," "thoroughly confused," and impressed with the "sinister character of the damnable term 'conspiracy.' " [9]

We have accorded the judge's supplemental charge a most careful review and though perhaps it was a bit "long," we find it to be in all respects fair and proper.

### III.

■ Appellant Spieler claims that Agent Bruh's persistent efforts to be offered an amount in excess of $5,000, his insistence on meeting with Spieler face-to-face, and his repeated suggestions that Siegel be persuaded to turn to others to raise the bribe monies prove that Spieler was entrapped as a matter of law. Although not raised as a defense at trial, the court, presumably because of what Spieler had said during his testimony, instructed the jury with reference to the law of entrapment.[10] The judge's instruction was not objected to at trial nor is it challenged here. Rather, appel-

lant Spieler contends that we should reverse his conviction because of his entrapment in spite of his lack of reliance upon that defense at trial. Apart from the fact that this ground is raised for the first time on appeal, see, e.g., United States v. Bishop, 367 F.2d 806, 809 (2 Cir. 1966), it seems certain that the jury could surely have properly found that the defendants "initiated" the crime and had the "propensity" to commit it. E.g., United States v. Weiser, 428 F.2d 932 (2 Cir. 1969). Accordingly we hold that Bruh did not entrap Spieler to commit the crimes for which he was indicted and, moreover, we add that Bruh's conduct does not "shock the conscience of the court." See, e.g., United States v. Smalls, 363 F.2d 417, 420 (2 Cir. 1966), cert. denied, 385 U.S. 1027, 87 S.Ct. 755, 17 L.Ed.2d 675 (1967).

### IV.

After conviction and before sentencing appellant Spieler moved the trial court to set aside the verdict and order a new trial. The trial court denied the motion without granting Spieler a hearing on the merits of his claims. The ground for the motion, "newly discovered evidence," was alleged to be Jacobs's first-time revelation to Spieler, after the verdicts were rendered, that portions of the May 5 tape contained portions of a telephone conversation between Jacobs and Bruh in Jacobs's office on April 26. Spieler alleged that the Government had doctored the tape of the May 5 meeting by inserting onto that tape certain recordings of Spieler's telephone voice recorded on April 26, and that conversations he pur-

---

9. Brief for defendant Jacobs, at 14, 21–22, 23. The brief for defendant Spieler does not contain the quoted language, but states, at 30: "Argument in respect of errors in the Charge is contained in the Brief on behalf of the codefendant Jacobs and will not be repeated herein. Spieler adopts said argument and relies thereon."

   The only specific allegation of prejudice advanced by appellants concerning the supplemental charge is that the court should have related its instructions to a "two-man conspiracy" rather than to conspiracies involving more than two mem-

   bers. However, the judge had already instructed the jury as to "two-man conspiracies" (see the instruction set out at note 8 *supra*) prior to the jury's retiring to deliberate, and the defendants did not request him to repeat that charge. Contrary to appellants' position, the court's supplemental charge was responsive to the jury's question and did not depart from "the law of the case."

10. Spieler testified that on May 5 Bruh "tried to create the impression to me that if he had money he could save Mr. Siegel from any further trouble."

portedly held with Bruh on May 5 were actually conversations between him and Jacobs on April 26. Other portions of the May 5 tape, according to Spieler's affidavit, were not recordings of his voice at all, his claim being that his voice had been somehow simulated and a recording of the simulated voice sworn to as being his voice. The denial of the motion was proper.

First, Spieler's "newly discovered evidence" was not "newly discovered" at all. Spieler brought up this very issue at trial but, as stated in his affidavit in support of the motion, he explicitly declined at trial to pursue his contention that the May 5 tape did not reflect what he had actually said on May 5 and was an altered tape.[11]

Spieler attributes his abandonment of the claim at trial to the poor advice of his trial counsel and the fact that he himself was not "thinking clearly and was in a state of shock, overwhelmed by financial problems and the humiliation that faced him if convicted." We can understand an accused's frame of mind during the course of his prosecution, but the trial judge was in a better position than we to assess Spieler's capacity to understand the nature of the forensic proceedings as the trial progressed. Moreover, while testifying, Spieler took a position diametrically opposed to that taken in his motion. Spieler stated that whatever conversations he had had with Jacobs between April 18 and May 4 related only to money he owed Jacobs. Furthermore, while testifying at trial he admitted speaking the very words he claimed in his post-trial motion to have been improperly simulated or transposed. It is little wonder that the

court below declined to reopen the issue and regarded the matter as closed.

### V.

Appellants' final point raises the legality of the use in this case of electronic eavesdropping devices. We decline to depart from our former decision on this point, which squarely holds contrary to appellants' contention that their fourth amendment rights were violated. United States v. Kaufer, 406 F.2d 550 (2 Cir.), aff'd, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969). See also United States v. Kelly, 420 F.2d 26, 29 n.1 (2 Cir. 1969); contra, United States v. White, 405 F.2d 838 (7 Cir.), cert. granted, 394 U.S. 957, 89 S.Ct. 1305, 22 L.Ed. 2d 559 (1969).

The judgments of conviction are affirmed.

11. Also prior to the trial in a letter dated September 9, 1967 to the Foreman of the Grand Jury before which he had testified, Spieler stated:

> In certain portions of the recording [of the May 5 meeting] where the voice is supposed to be mine, it is not my voice. Certain portions of the recording did not take place on May 5, 1967, the only time I ever personally saw or talked to Spe-

cial Agent Bruh, which was at the office of my client, Mr. Morton Jacobs.
\* \* \* In other words, the tape recording includes part of a conversation between Mr. Jacobs and myself which took place at an entirely different time and has been inserted in such a way as to appear as part of the May 5, 1967 conversation.