NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports. If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13475

COMMONWEALTH  vs.  JAMES BELLARD.


Essex.      December 4, 2023. - August 8, 2024.

Present: Budd, C.J., Gaziano, Kafker, Wendlandt, & Georges, JJ.


Intimidation of Witness. Witness, Intimidation, Victim.
    Bribery. Value. Evidence, Value. Practice, Criminal,
    Required finding.



Complaint received and sworn to in the Lynn Division of the
District Court Department on September 30, 2016.

The case was heard by Ellen Flatley, J.

After review by the Appeals Court, 102 Mass. App. Ct. 1116
(2023), the Supreme Judicial Court granted leave to obtain
further appellate review.


David M. Osborne for the defendant.
Kristen W. Jiang, Assistant District Attorney, for the
Commonwealth.


BUDD, C.J. James Bellard was convicted under the witness

intimidation statute, G. L. c. 268, § 13B (§ 13B), as a result

of two telephone calls made to his fiancée while he was being

held in a house of correction, as he waited to be tried for

domestic assault and battery. For the reasons discussed infra, we reverse.

Background. We summarize the facts based on the record and the evidence presented at trial in the light most favorable to the Commonwealth, leaving some details for later discussion.

In June 2016, the defendant was charged with assault and battery on a family or household member pursuant to G. L. c. 265, § 13M (a), and was detained pretrial on dangerousness grounds. See G. L. c. 276, § 58A. Less than two weeks before trial was scheduled to begin, the defendant called his fiancée, the alleged victim, twice from a house of correction on a recorded line.[1]

During the telephone calls, the defendant's fiancée expressed frustration that police had been coming to her home repeatedly in an effort to secure her cooperation in the prosecution of the defendant. She also expressed concern that she would lose her housing and custody of her children due to the attention she was receiving from police and the Department of Children and Families (DCF). The defendant responded, "You know I go to court August 2nd, so don't answer the door or

---

[1] Although the defendant contests the sufficiency of the Commonwealth's proof that he and his fiancée were the individuals on the recordings, because we conclude that the evidence was insufficient to support the defendant's conviction, we assume, without deciding, that the defendant and his fiancée were the parties on the telephone call.

nothing for nobody."  Citing conversations with his attorney and others "in the same predicament," the defendant advised his fiancée that the authorities were just "play[ing] hardball" and that "if [she is] not there [at his trial], they can't do too much[,] man, that's all I'm saying[,] man.  You know what I mean, it's common sense.  Everybody knows that . . . ."  He also repeatedly told her, "You need to listen to me."  For instance, at one point, the defendant stated, "You need to listen to me so I can tell you this is how it's going to go away, stop answering them, stop responding, stop opening the door."  Later in the conversation, the defendant stated, "I just need you to -- you know what I mean -- to actually listen, and do actually what I'm telling you to do for this shit, you know what I mean, make this shit just go away, man.  As your man, you should listen to the man that knows . . . ."

The defendant additionally affirmed their preexisting plan to marry, told her that he did "care about . . . [their] family," and stated that she would not "be going through this" if he "was out there with [her]."  At one point, the fiancée commented "all you keep telling me is what not to do" and asked, "What do you want me to do?"  The defendant responded, "Girl, you do whatever you choose you want to do . . . .  Whatever you think that's going to help you and benefit your situation."

The fiancée appeared at the defendant's assault and battery trial in September 2016 only after the court issued a capias warrant to compel her attendance. After a hearing in which she was represented by counsel, she chose to exercise her privilege against self-incrimination and did not testify.[2]

Soon thereafter the Commonwealth charged the defendant with witness intimidation under § 13B. During the jury-waived trial, the Commonwealth presented the two recorded telephone conversations and proceeded on the theory that the defendant "convey[ed] a gift, offer or promise of anything of value" to the fiancée to dissuade her from testifying against him at his assault and battery trial in violation of G. L. c. 268, § 13B (1) (b), as amended through St. 2010, c. 256, § 120 (§ 13B [1] [b]). The Commonwealth argued that the relationship between the defendant and his fiancée, which the defendant told the fiancée he would maintain, constituted something "of value" to her, as did the support the defendant suggested he could provide to the fiancée and her children on his release.

After a jury-waived trial, the judge denied the defendant's motion for a required finding and found him guilty.[3] The

_____

[2] The trial was continued to February 2017, at which time a jury acquitted the defendant of the assault and battery charge.

[3] The judge found that the thing of value was an offer of marriage. However, the Commonwealth concedes on appeal that

conviction was affirmed by the Appeals Court.  Commonwealth v.

Bellard, 102 Mass. App. Ct. 1116 (2023) (memorandum and order

pursuant to its rule 23.0).  We granted the defendant's

application for further appellate review.

Discussion.  Although it is known as the witness

intimidation statute, § 13B prohibits more than acts of

intimidation, threats, or violence against witnesses.  The

portion of the statute relied on by the Commonwealth in this

prosecution provides:

> "Whoever, directly or indirectly, willfully . . . conveys a gift, offer or promise of anything of value to . . . another person who is . . . a witness or potential witness . . . with the intent to impede, obstruct, delay, harm, punish or otherwise interfere thereby, or do so with reckless disregard, with such a proceeding shall be punished . . . ."

G. L. c. 268, § 13B (1), as amended through St. 2010, c. 256,

§ 120.[4]  In other words, it prohibits the offer of a bribe to a

witness or potential witness.  Commonwealth v. Hamilton, 459

Mass. 422, 434 & n.16 (2011).  See Commonwealth v. Cruz, 442

Mass. 299, 309 (2004) ("An essential element of [§ 13B] is the

---

this finding was error as the two had preexisting plans to marry.

[4] General Laws c. 268, § 13B, was amended in 2018.  See St. 2018, c. 69, § 155.  However, we refer to the version in effect at the time of the offense.  See G. L. c. 268, § 13B, as amended through St. 2010, c. 256, § 120.  The relevant language of the statute remains largely unchanged.

offer of a bribe or the use of intimidation, force, or the threat of force").

We review a denial of a motion for a required finding of not guilty to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Commonwealth v. Brown, 477 Mass. 805, 811-812 (2017), cert. denied, 139 S. Ct. 54 (2018), citing Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979). Because the Commonwealth charged the defendant with violating § 13B on the theory that the defendant willfully conveyed a "gift, offer or promise of anything of value" to a witness, we assess only the sufficiency of the Commonwealth's evidence that the defendant made such an offer or promise.[5]  See Commonwealth v. Pfeiffer, 492 Mass. 440, 451 (2023).

The defendant argues that the Commonwealth failed to prove that he offered anything of value to his fiancée in the manner proscribed by § 13B (1) (b) -- namely, as a bribe.  See Scaccia v. State Ethics Comm'n, 431 Mass. 351, 355-356 (2000) ("Bribery

---

[5] We do not assess whether the Commonwealth's evidence was sufficient with respect to other grounds on which § 13B may be violated, such as a defendant's harassing, misleading, or threatening conduct.  See Commonwealth v. Pfeiffer, 492 Mass. 440, 451 (2023), quoting Chiarella v. United States, 445 U.S. 222, 236 (1980) ("conviction cannot be affirmed 'on the basis of a theory not presented to the jury" by Commonwealth).  For this reason, the concern raised by the dissent that today's opinion will result in increased impunity for those who intimidate domestic violence victims, see post at    , is misplaced.

. . . typically involves a quid pro quo . . . . In effect, what is contemplated is an exchange, involving a two-way nexus," in which gratuities are conveyed "for or because of" official acts performed [citation omitted]). The Commonwealth asserts that the defendant promised his fiancée various things of value, including that their lives would return to normal, that they could continue their relationship, and that DCF would discontinue its investigation of the fiancée's parental fitness if she agreed not to come to his trial and testify against him. Nevertheless, the Commonwealth has failed to offer proof that the defendant made any such promise in violation of § 13B (1) (b).

1. Personal relationship. Although the statute does not define the word "value," neither party disputes that in this context, the term may refer to things (tangible or intangible) that are of significance, desirability, or importance to the witness, potentially including a personal relationship. See Black's Law Dictionary 1864 (11th ed. 2019); Merriam-Webster's Collegiate Dictionary 1382 (11th ed. 2020). Cf. Commonwealth v. Hayes, 311 Mass. 21, 27 (1942) ("A gift or gratuity will not support an indictment for soliciting or accepting a bribe unless the thing requested or accepted was something of value to the person seeking or obtaining it"). Here, the Commonwealth's vague descriptions of the defendant's relationship with his

fiancée do not identify with adequate specificity a "thing" offered or promised to his fiancée as an inducement not to testify.

Due process requires "that a defendant be given notice of the charges against him and an opportunity to defend himself." Commonwealth v. Walker, 426 Mass. 301, 305 (1997), quoting Commonwealth v. Eaton, 2 Mass. App. Ct. 113, 117 (1974). At a minimum, then, the Commonwealth must identify the thing that has been offered or promised. That is, in prosecuting any bribery offense, the government must account adequately for both the "quid" and the "quo." See Scaccia, 431 Mass. at 355-356 & n.7, citing United States v. Sun-Diamond Growers of Cal., 526 U.S. 398, 405-406 (1999).

Although a promise of an interpersonal relationship might constitute a thing of value for purposes of § 13B (1) (b) on sufficient, particularized facts, the Commonwealth has failed to describe the defendant's "offer" with any specificity. Instead, the Commonwealth vaguely gestures without elaboration to the defendant's expression of a vague interest in continuing his relationship with his fiancée.

The Commonwealth's account is particularly nebulous because the object of this purported bribe -- i.e., the relationship -- appears open ended and unstable, capable of offering the fiancée undefined things of value in the future. See C.O. v. M.M., 442

Mass. 648, 653 (2004) ("Dating is inherently personal and idiosyncratic, and relationships exist in endless variety"). Thus, the fact that the defendant spoke of maintaining a personal relationship, without more, is too amorphous to constitute a promise under § 13B (1) (b). Cf. Sun-Diamond Growers of Cal., 526 U.S. at 405 (vacating gratuity conviction, where defendant received in return nothing more than "reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future"); Scaccia, 431 Mass. at 356-357 (vacating gratuity conviction of elected official because Commonwealth must "link" gratuity paid to "identifiable official acts" and not "merely" prove defendant "was in a position to take some undefined or generalized action").

In the same manner, here, the Commonwealth hints at potential benefits that we might infer the witness could enjoy within the context of a supportive dating relationship. However, the Commonwealth has not demonstrated that the defendant promised his fiancée that anything more definite would materialize. Contrast Commonwealth v. Henderson, 434 Mass. 155, 156-157 & n.4 (2001) (defendant's "repeated pleas, some linked to promises of financial compensation or marriage proposals," contained identifiable offers of things of value under § 13B [1] [b]); United States v. Marmolejo, 89 F.3d 1185, 1192-

1193 (5th Cir. 1996), aff'd sub nom. <u>Salinas</u> v. <u>United States</u>, 522 U.S. 52 (1997) (discrete conjugal visits paid for by inmate considered to be "thing of value" under statute prohibiting bribery).

Moreover, notwithstanding whether the relationship could be construed as one definitive "thing" subjectively valued by the fiancée, the Commonwealth has not demonstrated that the relationship was being leveraged by the defendant in an attempt to strike a bargain.  The text and structure of § 13B (1) (<u>b</u>) contemplate an attempt to trade on or conditionally offer some asset in exchange for a witness's noncooperation.  See G. L. c. 268, § 13B (1), as amended through St. 2010, c. 256, § 120 (prohibiting "willfully" conveying valuable gifts, offers, or promises "with the intent to," or "with reckless disregard" for fact that such gift, offer, or promise may interfere with legal proceeding).

Clearly, the defendant hoped that his fiancée would decide not to attend his trial and tried to convince her to help him and to follow his advice.[6]  However, at no point did the defendant offer to continue the relationship in exchange for his fiancée's noncooperation or suggest that his emotional

_____

[6] The defendant advised his fiancée, at various points in the conversation, that she was not obligated to testify and that she need not respond to police officers who came to her door.

commitment to her hinged on the outcome of the case.  Nor did he imply, even indirectly, that he would withhold or amplify his affections based on her decision.[7]  In this manner, the conversation differed significantly from a "quid pro quo" proposal that would violate § 13B (1) (b), in which one thing of value conditionally is "exchange[d]" for another.[8]  Scaccia, 431 Mass. at 355-356.  Absent "proof of [any] linkage" between the defendant's aspirations to continue the relationship and the witness's noncooperation, id., the defendant's actions do not amount to a violation of § 13B (1) (b).

In sum, the Commonwealth failed to offer proof beyond a reasonable doubt of the basic elements of the charged offense.

---

[7] By contrast, in Henderson, where we affirmed the defendant's conviction, the defendant wrote letters that expressly conditioned various offers, including an offer of marriage, on the witness's agreement to lie on his behalf. Henderson, 434 Mass. at 156-157 & n.4 ("I have [$150], plus food stamps, get me out of here and they are all yours. . . .  Tell them I did not hit you . . .").  See Commonwealth v. Ruano, 87 Mass. App. Ct. 98, 99 (2015) ("In asking the witness to recant, the defendant stated that the witness 'could make 200 plus friends and . . . could have the key to the city . . .").

[8] Cases discussing quid pro quo arrangements in other contexts consistently define them as involving requests for a specific result in exchange for a conditional offer of something of value.  See, e.g., Commonwealth v. LeBlanc, 433 Mass. 549, 553 (2001) (no "quid pro quo" where police did not condition offer of psychological help on defendant's "waiver or confession"); College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 163 (1987) (defining "'quid pro pro' harassment" as harassment where supervisor "conditions tangible job benefits" on satisfaction of illicit demands).

First, the fact finder, provided with only a vague and amorphous concept of the thing of value offered by the defendant to his fiancée, "would necessarily have had to employ conjecture" to conclude that any of the defendant's statements to his fiancée about their relationship operated as a bribe.[9] Commonwealth v. Ferguson, 384 Mass. 13, 18-19 (1981).  Second, the Commonwealth failed to offer proof beyond a reasonable doubt that the defendant conditioned his emotional commitment on his fiancée's noncooperation.  Therefore, the defendant's conviction cannot be sustained on the basis of the Commonwealth's contention that the defendant leveraged their relationship as a bribe.

2.  DCF investigation.  The Commonwealth also contends that the defendant violated § 13B (1) (b) by telling his fiancée that the DCF investigation likely would be closed if she did not testify at his trial.  Although the fiancée indicated that such an outcome was desirable to her, the Commonwealth has failed to

---

[9] The dissent points out that abusers use "subtle manipulation tactics in the form of promises and reassurances about the relationship to convince victims not to go to the police or to testify against them after an incident of abuse, rather than threats of violence," and therefore, "'vague' and 'amorphous' promises about a couple's relationship . . . could be an effective means of silencing a domestic violence survivor."  Post at  .  This undoubtedly is true.  However, here the question is whether the Commonwealth has provided a sufficiently definitive, clear account of the object of the alleged promise, as required under § 13B (1) (b).

demonstrate that the defendant violated § 13B in connection with this prediction.

First, the Commonwealth has provided no evidence that the defendant had the power to effectuate that outcome.  For a promise to have any meaning, the promisor must have some conceivable ability to deliver.[10]  See Black's Law Dictionary 1304, 1466 (11th ed. 2019) (defining "offer" as "a display of willingness to enter into a contract on specified terms" and "promise" as "[t]he manifestation of an intention to act . . . conveyed in such a way that another is justified in understanding that a commitment has been made").  Here, the defendant never had, nor could he reasonably have been expected to have, power to terminate the DCF investigation or even to

---

[10] As the dissent notes, it is possible to run afoul of § 13B (1) (b) by promising an inducement that ultimately proves to be out of reach.  See post at    & note 5.  However, a defendant plausibly must be positioned to offer the other party something of value.  The dissent cites to several cases in which a bribery conviction was affirmed, even though at least one of the promises constituting the corrupt transaction never was fulfilled.  Id.  However, in those cases, each party to the contemplated transaction had -- or reasonably could be expected to have -- the ability to deliver on their promise.  See, e.g., United States v. Johnson, 621 F.2d 1073, 1076-1077 (10th Cir. 1980) (affirming bribery conviction, where defendant paid gratuity to official in position to influence procurement policies, even though government had not demonstrated defendant actually influenced official action); State v. O'Donnell, 255 N.J. 60, 74 (2023) (affirming mayoral candidate's bribery conviction, even though candidate was not, in end, elected to position from which he could deliver official acts in exchange for $10,000 gratuity he received in advance).

make that sought-after outcome marginally more likely to occur. In other words, the defendant had nothing to offer with respect to the DCF investigations of his fiancée's household; he had no perceptible basis on which to transact or scheme.[11]  Therefore, he was not in a position to propose a quid pro quo.  See Scaccia, 431 Mass. at 356 ("[b]ribery" involves "an exchange, involving a two-way nexus" [emphasis added]).  Cf. Percoco v. United States, 598 U.S. 319, 322, 331-333 (2023) (vacating honest services fraud conviction of private citizen, who accepted payments while on brief hiatus from public office, where jury instructions did not require showing that defendant actually "dominated and controlled" government business).  His statements regarding the DCF investigation, therefore, did not violate § 13B (1) (b).

Nor has the Commonwealth pointed to any evidence demonstrating that the fiancée believed that the defendant had such power.  The record indicates that both the defendant and the fiancée understood the discussion to center on the fiancée's

---

[11] This case is distinguishable from circumstances in which a defendant attempts to bribe a witness or official with funds of an amount that the defendant ultimately cannot raise.  See, e.g., United States v. Jacobs, 431 F.2d 754, 759-760 (2d Cir. 1970), cert. denied, 402 U.S. 950 (1971).  Whereas such defendants, at the very least, offer a form of value that is widely held among the general population (i.e., funds), see id. at 756-758, here, the Commonwealth alleges the defendant tried to offer his fiancée a form of value exclusively held by public officials within DCF.

ability, not his, to achieve that outcome. Throughout their conversation, the defendant encouraged his fiancée to use her ability to impede both the criminal and DCF investigations.[12] For instance, after his fiancée stated, "I need [DCF] to leave me alone," the defendant stated that if she "listen[ed]" to him and "stop[ped] opening the door" for police, the investigation could not continue. By contrast, he referenced no action he planned on undertaking to provide her with that purported thing of value. In fact, the defendant did not contradict his fiancée when she indicated she believed that the defendant's release was likely to lead, if anything, to continued investigation by DCF.[13]

Both the Commonwealth and the dissent rightly urge this court to consider the context informing the defendant's conversation with his fiancée, especially the evidence that the defendant had committed violence against her, in our review of his conviction. We certainly look to the history of the relations between a defendant and witness to assess the

---

[12] To the extent the dissent suggests that the defendant "held himself out as having superior knowledge of the legal system" and thereby misled his fiancée, post at    , the Commonwealth did not prosecute the defendant for "mislead[ing]" a witness, see G. L. c. 268, § 13B (1) (c), as amended through St. 2010, c. 256, § 120. Therefore, that argument is beyond the scope of our review. See Pfeiffer, 492 Mass. at 451.

[13] As the fiancée told the defendant, "[DCF] ain't gonna leave you alone. And they're going to keep bothering you and -- I'm not trying to deal with that fucking shit, man, I'm tired of it."

character of any communications between them per § 13B, as is appropriate and necessary.  See, e.g., Commonwealth v. Gardner, 102 Mass. App. Ct. 299, 305-306 (2023) (upholding § 13B conviction of witness intimidation, given "ample evidence" that defendant exploited victim's trauma following "years of sexual, physical, and emotional abuse").

Yet, we cannot disregard our mandate to assess only that which is within the scope of our review.  Nor can we uphold the defendant's conviction on a theory that was not pursued at trial.  Dunn v. United States, 442 U.S. 100, 106 (1979) ("To uphold a conviction on a charge that was . . . [not] presented to a jury at trial offends the most basic notions of due process"); Pfeiffer, 492 Mass. at 451 ("the jury's verdict may not be affirmed on the basis that there was sufficient evidence to establish an alternative theory of the crime").  See G. L. c. 268, § 13B (1) (c), as amended through St. 2010, c. 256, § 120 (prohibiting misleading, intimidating, or harassing witness).  As an appellate court, we are "not free to revise the basis on which a defendant is convicted." Dunn, supra at 107.  Here, the Commonwealth did not pursue a theory of intimidation per se, misrepresentation, or harassment at trial.  Accordingly, we only review whether the Commonwealth sufficiently demonstrated that the defendant attempted to bribe his fiancée.  With respect to the theory the Commonwealth did pursue, the

Commonwealth has not demonstrated that any history of abuse imbued the conversations with sufficiently extortive elements, so as to transform the conversations into a prohibited bribe.

Conclusion.  Viewing the evidence in the light most favorable to the Commonwealth, there is an insufficient basis on which to conclude that the defendant willfully conveyed an "offer or promise" of "anything of value" to the witness in violation of § 13B (1) (b).  Because the Commonwealth's evidence was insufficient as a matter of law, the judgment is reversed, the finding is set aside, and judgment shall enter for the defendant.

So ordered.

GEORGES, J. (dissenting). Less than two weeks before the trial for his alleged assault and battery of the victim -- stemming from an earlier domestic violence incident -- and while he was detained pretrial on dangerousness grounds, see G. L. c. 276, § 58A, the defendant called the victim and insisted she not cooperate with the police or the district attorney. The jailhouse recordings of their conversations paint an unsettling picture. During his first call with the victim, the defendant took a prescriptive tone; he repeatedly instructed the victim not to answer her telephone, not to "open[] the door" for "anyone," and to "listen" to him.

Eventually, the defendant switched tactics, taking a more conciliatory approach. He began telling the victim that it was in her best interest not to testify, contending the hardships she was facing -- including pressure from authorities to testify in the criminal proceeding and the possibility of losing her children -- would be obviated if she stopped responding. At one point, the victim questioned whether the defendant "care[d] about [her] losing the kids," and then hung up on the defendant.

The defendant called the victim back within seconds and began reassuring her that he cared about their relationship, her children, and their family. He then implied if "[he] was out there with [her]," he would assist her in putting an end to the Department of Children and Families (DCF) case against her. The

defendant then reiterated that the other hardships she faced would end if she avoided answering the door on the day of his trial. In response, the victim confirmed she did not plan to testify. True to her word, the victim did not testify against the defendant at trial.[1] A jury then acquitted the defendant of the assault and battery charge.

As a result of the defendant's conversations with the victim, the Commonwealth charged him under the witness intimidation statute, G. L. c. 268, § 13B, as amended through St. 2010, c. 256, § 120 (§ 13B).[2] At the ensuing bench trial, after hearing from the Commonwealth's witnesses and listening to the jailhouse recordings in their entirety, the trial judge concluded the defendant was "obviously attempting to convince the witness not to show up in [c]ourt, [and] not to accept summonses," and he found the defendant guilty of violating § 13B (1) (b), by attempting to bribe an anticipated witness in his upcoming trial.

---

[1] The victim appeared for the defendant's trial in September 2016 only after the court issued a civil arrest warrant to compel her attendance; however, she asserted her rights under the Fifth Amendment to the United States Constitution and did not testify.

[2] As the court notes, the witness intimidation statute was amended in 2018. See ante at note 4, citing St. 2018, c. 69, § 155. We refer to the version in effect at the time the defendant was charged. Furthermore, "[t]he relevant language of the statute remains largely unchanged." Ante at note 4.

The court concludes the evidence was insufficient to prove the defendant conveyed an "offer or promise" of "anything of value" to the witness for purposes of § 13B (1) (b).  In my view, the evidence was sufficient.  Accordingly, I must respectfully dissent.

1.  Sufficiency of the evidence.  On our review of the denial of the defendant's motion for a required finding of not guilty, "we must consider and determine whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the [fact finder] to infer the existence of the essential elements of the crime charged" (citation omitted).  Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  In conducting this review, we "draw[] all inferences in favor of the Commonwealth" (citation omitted).  Pinney v. Commonwealth, 479 Mass. 1001, 1003 (2018).  "While the inferences drawn must be reasonable, they need not be necessary or inescapable" (quotation and citation omitted).  Id.

The court contends there was insufficient evidence the defendant, either "directly or indirectly, . . . convey[ed] a gift, offer or promise of anything of value to" the victim.  G. L. c. 268, § 13B (1) (b), as amended through St. 2010, c. 256, § 120.  Because the court concludes, as the defendant argues, the evidence was lacking on this element of the offense,

it does not reach the defendant's other argument that he lacked the requisite mental state -- that is, "the intent to impede or interfere with the investigation or proceeding." Commonwealth v. Fragata, 480 Mass. 121, 122 (2018) (interpreting intent requirement under G. L. c. 268, § 13B [1], as amended through St. 2010, c. 256, § 120).  I address both elements in turn.

a.  Promise of anything of value.  Turning first to the "[]thing of value," G. L. c. 268, § 13B (1) (b), as amended through St. 2010, c. 256, § 120, I agree with the court's conclusions that a "thing" may be tangible or intangible, so long as it is of significance, desirability, or importance to the witness, and that "value" is defined by the subjective interests of the witness.  See ante at   .  See also Black's Law Dictionary 1864 (11th ed. 2019); Merriam-Webster's Collegiate Dictionary 1382 (11th ed. 2020).  However, I disagree with the court inasmuch as a rational trier of fact could only conclude the "[]thing of value" offered by the defendant here was the mere continuation of the parties' relationship.  See ante at   ,   .  Instead, as the Appeals Court held, I conclude the evidence was sufficient to support a finding that the defendant promised the victim a "return to normalcy." Commonwealth v. Bellard, 102 Mass. App. Ct. 1116 (2023).  Put differently, the defendant promised the victim relief from the perceived hardships she was facing, whether those hardships came

in the form of pressure from the Commonwealth to testify against the defendant or the looming specter of a DCF investigation.

During the telephone calls with the defendant, the victim discussed these two forms of hardship.  First, she described her distress from the persistent efforts by the authorities to secure her testimony at the defendant's trial.  As she explained to the defendant:  "they came back to the house again . . . [a]nd told me that if I don't go to [c]ourt, I'll have a warrant for my arrest."[3]  The victim also informed the defendant the authorities were "banging on [her door] . . . all the time."  She expressed dismay over this disruption, especially when her "kids [were] in the house."  Additionally, she described "[s]omebody from the [district attorney's office] call[ing]" her and "sending [her] [two] and three papers at a time."  The victim said she was "frustrated" by these efforts and told the defendant she not only "want[ed] it to all stop," but "need[ed] it to stop."  The victim's statements clearly show that an end to these disruptions was both significant and desirable to her.  Accordingly, an end to these disruptions would constitute an intangible "thing" of subjective value to the victim for purposes of § 13B (1) (b).

---

[3] Although the victim does not explicitly state who came to her home, it is clear from the context that "[t]hey" refers to law enforcement personnel, and their visits were related to the charges pending against the defendant.

Similarly, activities by DCF were also causing the victim distress.[4]  She informed the defendant she had "a [DCF] case open" and "need[ed] [DCF] to leave [her] alone," fearing she could "[l]ose [her] fucking kids."  The victim punctuated her frustration with the DCF case, telling the defendant:  "I'm just sick of it and . . . for them to involve my children, that[] . . . ma[kes] me so fucking angry."  The victim's passionate language and repeated complaints indicate the DCF case -- which carried with it the possibility of losing custody of her children -- was a significant issue to her.  Further, her wish for "[DCF] to leave [her] alone" indicates she equally desired an end to the DCF case.  Thus, like an end to the disruptions caused by the defendant's criminal proceedings, an end to the DCF case also was a "thing" that the victim "valued" for purposes of § 13B (1) (b).

b.  Intent to interfere with criminal proceeding.  Second, there are several strong reasons for concluding there was sufficient evidence to show the defendant had "the intent to impede or interfere with the investigation or proceeding." Fragata, 480 Mass. at 122.  After the victim indicated she wanted the authorities to stop knocking on her door and reaching

---

[4] During the telephone calls, the victim referred to the Department of Children and Families by the initials "D.S.S.," likely referring to the department's former name, the "Department of Social Services."  See St. 2008, c. 176, § 25.

out to her, the defendant promised the victim an end to the disruptions. Specifically, the defendant repeatedly told the victim -- the only eyewitness to the alleged abuse -- if she "listen[ed]" to him, i.e., if she "stop[ped] answering" her telephone and "opening the door" when the authorities came, "that shit [would not] happen" and would "go away."

Additionally, the defendant repeatedly instructed the victim not to testify during their conversations. For example, after the victim referenced having to go to court or otherwise face arrest, the defendant warned her "[y]ou better not do that." Additionally, the defendant instructed the victim to refrain from answering the door on the day of trial. The defendant stated:

> "You gotta listen, you know what I mean. Don't answer your phone, don't go to the door, you know what I mean. You know the court date's on the second [of August], you know what I'm saying. Chill out. Don't answer shit, don't respond to them."

Later, the defendant told the victim:

> "Well, you know, I go to [c]ourt -- I go to [c]ourt the second [of August], man, you know what I mean. Hopefully they throw that shit out, you know what I mean. I just need you to -- you know what I mean -- to actually listen, and do actually what I'm telling you to do for this shit, you know what I mean, <u>make this shit just go away</u>, man" (emphasis added).

It is naive to think the defendant did not intend to dissuade the victim from cooperating with the prosecution, particularly when the defendant held himself out as having

superior knowledge of the legal system compared to the victim. Not only did the defendant tell the victim she "should listen to the man who knows," and she "[didn't] know the system [or] how it works," he fortified his intent by telling the victim his lawyer had said they would "both [be] good" if the victim did not testify. Regardless of whether the defendant's lawyer uttered these words, the defendant effectively signaled to the victim that his promises were backed by professional advice and thus were not merely his own predictions or aspirations. See Pinney, 479 Mass. at 1003; Latimore, 378 Mass. at 676-677.

As to the DCF investigation, the defendant's intent was equally palpable. During the telephone call, the defendant made the following statement to the victim: "Babe, you won't be going through this shit [with DCF] if I was out there with you, that's what I'm trying to say." In other words, the defendant was trying to convince the victim her DCF case would be over if she did not testify against him. Although the victim expressed skepticism as to how the defendant's release would affect the DCF case -- asking, "How won't I be going through it?" -- the defendant doubled down on his claim, answering, "Because I'll be out there with you."

2. Capability of fulfilling a promise. The court claims the defendant's inability to actually control the actions of the investigating or prosecuting authorities -- or to end the DCF

investigation -- renders his statements insufficient to sustain his conviction under § 13B (1) (b).  See ante at    .  The court supports its logic by interpreting the "promise" element of § 13B (1) (b), as requiring the Commonwealth to demonstrate the defendant conceivably had the ability to fulfill the purported promises.  See ante at    .

However, no such requirement appears in the statute's text, which does not limit "promise[s]" to include only those a defendant can personally fulfill, nor does it require proof of the feasibility of a "promise."  See G. L. c. 268, § 13B (1) (b), as amended through St. 2010, c. 256, § 120.  Indeed, to turn application of § 13B (1) (b) upon proof of a defendant's ability to keep his word would drastically narrow its reach, as a defendant could always avoid conviction by arguing any alleged promise could not be kept.  This cannot be squared with the statute's purpose "to protect witnesses from being bullied or harried so that they do not become reluctant to testify."  Commonwealth v. McCreary, 45 Mass. App. Ct. 797, 799 (1998).  See Commonwealth v. Morse, 468 Mass. 360, 367 (2014).  Stated pointedly, a witness may be bribed by a defendant making fulfillable and unfulfillable promises alike.[5]

---

[5] Courts in other jurisdictions have recognized that a person need not deliver on a promise to prove a bribery charge. See, e.g., United States v. Johnson, 621 F.2d 1073, 1076 (10th

For the reasons discussed, I conclude the evidence was sufficient to allow a rational trier of fact to find the elements of § 13B (1) (b) were satisfied beyond a reasonable doubt.  See Commonwealth v. Figueroa, 464 Mass. 365, 372 (2013).  Therefore, the trial judge did not err in denying the defendant's motion for a required finding of not guilty, and I would affirm the defendant's conviction.[6]

3.  Domestic violence statistics and victim psychology.  I also take this opportunity to contextualize the court's decision within the broader domestic violence crisis in the Commonwealth and explain how the decision will increase the risk of witness intimidation in domestic violence cases specifically.

Assault and battery on a family or household member (domestic assault), G. L. c. 265, § 13M (a), is the third most common of all charges -- and the most common violence charge -- filed in the Massachusetts community courts, the District and

---

Cir. 1980) ("object of [a] bribe need not even be attainable to support a conviction for offering [a] bribe"); State v. O'Donnell, 255 N.J. 60, 74 (2023) (bribery recipient's "inability to act and fulfill a promise is not a defense" to bribery charge).

[6] The defendant claims his intent was to "placate" the victim, rather than to interfere in his criminal proceeding. This argument fails, as it ignores the fundamental principle that the evidence must be viewed in the light most favorable to the Commonwealth.  See Latimore, 378 Mass. at 676-677.

Boston Municipal Court Departments.[7]  In the years 2020, 2021, and 2022, the District and Boston Municipal Court Departments considered over seventy percent of all trial court cases filed in the Commonwealth.[8]  Thus, domestic assault is the most common violent crime in the collectively largest departments of our trial court system.  In 2023, over 14,000 domestic assault cases were filed in the District and Boston Municipal Court Departments.[9]  By way of comparison, less than 10,000 simple assault and battery cases were filed in the District and Boston Municipal Court Departments the same year.[10]  These numbers suggest a person in the Commonwealth is more likely to be harmed in his or her own home than on the street.

Here, the facts of the underlying domestic assault case are far from uncommon:  In 2016, the police responded to a domestic violence call and found the victim bleeding from the mouth with

---

[7] See Trial Court, Department of Research and Planning, Charges Dashboard, https://public.tableau.com/app/profile /drap4687/viz/MassachusettsTrialCourtChargesDashboard/AllCharges [https://perma.cc/6KD2-L6S6?type=image].

[8] See Trial Court, Department of Research and Planning, New Case Filings by Fiscal Year and Type, https://public.tableau.com /app/profile/drap4687/viz/MassachusettsTrialCourtFY2022Year-End CaseFilings/TrialCourt [https://perma.cc/4NE3-L2WN?type=image].

[9] Trial Court, Department of Research and Planning, Charges Dashboard, supra.

[10] Trial Court, Department of Research and Planning, Charges Dashboard, supra.

injuries requiring an ambulance transport to the hospital. After the victim identified the defendant as the perpetrator, the defendant was arrested, charged with assault and battery on a household member, and detained pretrial on dangerousness grounds. At the defendant's trial, the victim -- the sole witness to the incident -- did not testify, and the defendant was acquitted.

There is good reason why this story sounds all too familiar. Psychological research around intimate partner violence suggests victims of domestic abuse may be particularly susceptible to witness intimidation and coercive control.[11] A theory for understanding why victims often remain in abusive relationships developed by psychologist Lenore Walker, known as "Battered Woman Syndrome" (BWS), outlines the methods abusers use to manipulate victims. Coleman, Battered Woman Syndrome, 10 Geo. J. Gender & L. 333, 333-334 (2009). BWS is prefaced on Walker's finding that domestic abuse usually occurs in a three-phase cycle of violence, including (1) the "tension-building" phase, which often involves verbal abuse; (2) the "battering

---

[11] The Governor recently signed into law a bill expanding the definition of domestic abuse under G. L. c. 209A, § 1, the abuse prevention statute, to include "coercive control." See St. 2024, c. 118, § 4 (defining "coercive control" as "a pattern of behavior . . . [or] a single act intended to threaten, intimidate, harass, isolate, control, coerce or compel compliance").

stage" when physical abuse occurs; and (3) the "honeymoon phase." Id. at 334-335.

During the "honeymoon phase," which immediately follows instances of abuse, the abuser engages in "contrite loving behavior," which may involve expressions of remorse, requests for forgiveness, and promises that the abuse will never occur again. Coleman, supra at 335. According to Walker's theory, this cycle causes survivors to develop "learned helplessness," characterized by the belief that one "lacks control over her abusive situation" and that escape is "impossible." Id. These feelings cause survivors to "become[] increasingly passive" and lose their "will to get out of the relationship," thus becoming trapped in the cycle of violence. Id.

Walker's theory carries two significant implications in the context of intimidation and improper influence of domestic violence victims, i.e., potential witnesses. First, Walker's theory suggests domestic violence victims are particularly susceptible to influence by their abusers due to "learned helplessness." Second -- and perhaps contrary to what one might expect -- Walker's theory suggests abusers are likely to use subtle manipulation tactics such as promises and reassurances about their relationships, rather than threats of violence, to convince victims not to go to the police or to testify against them after an incident of abuse. This is because abusers,

during the "honeymoon phase," use "contrite loving behavior" to convince victims to forgive -- or at least accept -- prior abusive conduct.

Armed with this knowledge, it becomes apparent that even seemingly "vague" and "amorphous" promises made by an abuser to a domestic violence survivor about their relationship, as the court frames it, ante at    , could be an effective means of silencing the victim.  Concededly, such promises may sometimes fall short of the requirements of § 13B (1) (b); nonetheless, courts should carefully consider all of an alleged abuser's statements, and all reasonable implications and inferences of those statements, to determine whether a "promise of anything of value" was made to the victim in exchange for her silence, her noncooperation with investigating and prosecuting authorities, and her resistance to testifying at trial.

I have no doubt some of the victims in the over 14,000 domestic assault cases that came before the community courts last year were trapped in the cycle of violence described by Walker.  I fear the court's decision to narrow the scope of the witness intimidation statute by requiring a provable ability to effectuate a promised outcome will greatly undermine the Commonwealth's ability to prosecute witness intimidation in future domestic violence cases.  For all the foregoing reasons, I respectfully dissent.